**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Rosalee Gonzalez, | No. CV-20-00757-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| US Human Rights Network, et al., | |
| Defendants. | |
| US Human Rights Network, | |
| Counterclaimant, | |
| v. | |
| Rosalee Gonzalez and John Doe Gonzalez, husband and wife, | |
| Counterdefendants. | |

## INTRODUCTION

Plaintiff Rosalee Gonzalez ("Plaintiff"), an Arizona resident who once worked remotely as the executive director of a Georgia-based entity called the U.S. Human Rights Network ("Network"), has sued Network and four members of Network's board of directors (none of whom are Arizona residents).  In a nutshell, Plaintiff alleges that she was misclassified as an independent contractor and then wrongfully terminated after she complained about her misclassification.  Network denies Plaintiff's claims and has asserted various counterclaims, including a counterclaim for indemnification for the legal expenses it incurred when defending other lawsuits that were allegedly caused by Plaintiff's missteps

while serving as its executive director.

This backdrop has generated extensive early motions practice.  Now pending before the Court are four motions: (1) a motion to dismiss for lack of personal jurisdiction filed by two of the board member defendants, Marcia Johnson-Blanco ("Johnson-Blanco") and Eric Tars ("Tars") (Doc. 21); (2) a motion to dismiss for lack of personal jurisdiction filed by a third board member defendant, Lisa Crooms-Robinson ("Crooms-Robinson")[1] (Doc. 40); (3) Plaintiff's motion to dismiss Network's indemnification counterclaim premised on the other lawsuits (Doc. 15); and (4) Plaintiff's motion to permit alternative service on the fourth board member, Swiss resident Monami Maulik ("Maulik"), via Maulik's Arizona-based counsel (Doc. 46).  For the following reasons, both motions to dismiss for lack of personal jurisdiction are granted, as is Plaintiff's motion to dismiss the counterclaim, but Plaintiff's motion to permit service via Maulik's counsel is denied.

## BACKGROUND

I.   Factual Background

Plaintiff is an Arizona resident who, in late 2017 or early 2018, held a teaching position at Arizona State University.  (Doc. 11 ¶ 1-2; Doc. 12 at 14 ¶ 12.)  Network is a Georgia-based non-profit organization dedicated to advancing human rights throughout the United States.  (Doc. 11 ¶ 2; Doc. 12 at 13 ¶ 7.)

In early 2018, Network hired Plaintiff to serve as its interim Executive Director. (Doc. 12 at 1 ¶¶ 13; Doc. 25 at 17 ¶ 3.)  She continued in that role under a series of independent contractor agreements ("IC Agreements") for all of 2018.  (Doc. 12 at 14-16 ¶¶ 14-23; Doc. 25 at 17-18 ¶ 4; Doc 21-3 [IC Agreement dated Feb. 9, 2018]; Doc. 21-4 [IC Agreement dated May 15, 2018].)  During this period, Plaintiff generally performed her work duties remotely, via her home in Arizona.  (Doc. 25 at 20 ¶ 21.)

In January 2019, pursuant to negotiations that began in October 2018, Network offered to hire Plaintiff as its full-time Executive Director.  (Doc. 11 ¶ 8; Doc. 12 at 16

---

[1]      The introductory paragraph of the complaint uses the last name "Crooms-Robins" (Doc. 11 at 1) but subsequently uses the last name Crooms-Robinson (*id.* ¶ 5).  Subsequent filings make clear that the correct last name is Crooms-Robinson.  (Docs. 40, 45.)

¶¶ 24-25; Doc. 21-5 [offer letter: "You will work remotely from Phoenix, Arizona with expected travel to [Network's] office in Atlanta, Georgia as is required to fully execute the work of [Network]."]; Doc. 25 at 17 ¶¶ 8-11.)  The parties dispute what happened next. Plaintiff asserts that she and Network agreed that she would take over as the full-time Executive Director with all the attendant employee benefits, including personal, sick, and vacation time and reimbursement of business expenses.  (Doc. 11 ¶¶ 8-12.)  Network alleges that Plaintiff did not accept its offer of full-time employment, that negotiations eventually broke down, and that the parties thus continued operating under the terms of their most recent IC Agreement.  (Doc. 12 at 16-18 ¶¶ 24-30, 34-39.)

On November 22, 2019, Network terminated Plaintiff's employment.  (Doc. 11 ¶ 26; Doc. 12 at 17 ¶ 30.)  The parties disagree about the reasons for this termination. Plaintiff alleges that Network fired her in retaliation for her repeated complaints regarding her misclassification as an independent contractor and related denial of benefits.  (Doc. 11 ¶¶ 13-26, 31-34.)  Network asserts that it terminated her for non-retaliatory reasons related to her management style and performance.  (Doc. 12 at 17 ¶ 31.)

The remaining four defendants are individuals employed at relevant times as members of Network's board of directors.  (Doc. 11 ¶¶ 3-6; Doc. 21 at 5-6; Doc. 40 at 4.) Johnson-Blanco served as the chair of Network's board and resides in Maryland.  (Doc. 21 at 6.)  Tars served as vice-chair and resides in Pennsylvania.  (*Id.* at 5.)  Crooms-Robinson served as treasurer and resides in the District of Columbia.  (Doc. 40 at 4.)  Maulik served as secretary and is believed to be residing in Switzerland.  (Doc. 46.)  Johnson-Blanco, Tars, and Crooms-Robinson (collectively, "Board Members") have appeared in this action to contest personal jurisdiction, while Maulik has not yet been served and has not appeared. (Docs. 21, 40, 46.)

II.   Procedural Background

On March 18, 2020, Plaintiff filed a complaint in Maricopa County Superior Court. (Doc. 1-3.)

On April 20, 2020, Network removed the action to this court.  (Doc. 1.)

On May 8, 2020, Plaintiff filed a first amended complaint ("FAC").  (Docs. 10, 11.)

On May 22, 2020, Network filed an answer and counterclaims.  (Doc. 12.)

On June 12, 2020, Plaintiff filed a motion to partially dismiss Network's counterclaims.  (Doc. 15.)  This motion is now fully briefed.  (Docs. 22, 24.)

On June 26, 2020, Johnson-Blanco and Tars filed a motion to dismiss for lack of personal jurisdiction.  (Doc. 21.)  This motion is now fully briefed.  (Docs. 25, 27.)

On September 8, 2020, Crooms-Robinson filed a motion to dismiss for lack of personal jurisdiction.  (Doc. 40.)  This motion is now fully briefed.  (Docs. 45, 49.)

On October 14, 2020, Plaintiff filed a motion to permit service upon Maulik via counsel.  (Doc. 46.)  No response or reply has been filed.

## DISCUSSION

I.    Board Members' Motions To Dismiss For Lack Of Personal Jurisdiction

A.    **Legal Standard**

A defendant may move to dismiss for lack of personal jurisdiction.  Fed. R. Civ. P. 12(b)(2).  "In opposing a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper."  *Ranza v. Nike*, *Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015) (citation omitted).  "Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss."  *Id.* (citations and internal quotation marks omitted). "[U]ncontroverted allegations must be taken as true, and [c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor," but "[a] plaintiff may not simply rest on the bare allegations of [the] complaint."  *Id.* (citations and internal quotation marks omitted).

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons."  *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1141 (9th Cir. 2017) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)).  "Arizona law permits the exercise of personal jurisdiction to the extent permitted under the United States

Constitution." *Id.* (citing Ariz. R. Civ. P. 4.2(a)). Accordingly, whether this Court has "personal jurisdiction over Defendants is subject to the terms of the Due Process Clause of the Fourteenth Amendment." *Id.*

"Constitutional due process requires that defendants 'have certain minimum contacts' with a forum state 'such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Minimum contacts exist "if the defendant has continuous and systematic general business contacts with a forum state (general jurisdiction), or if the defendant has sufficient contacts arising from or related to specific transactions or activities in the forum state (specific jurisdiction)." *Id.* at 1142 (internal quotation marks omitted).

Plaintiff does not contend that Johnson-Blanco, Tars, or Crooms-Robinson are subject to general jurisdiction in Arizona. Thus, the Court must apply the Ninth Circuit's three-prong test to determine whether the Board Members have sufficient contacts with Arizona to be subject to specific personal jurisdiction:

> (1)  The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

> (2)  the claim must be one which arises out of or relates to the defendant's forum-related activities; and

> (3)  the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Id.* "The plaintiff bears the burden of satisfying the first two prongs of the test." *Id.* (internal quotation marks omitted). "If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state." *Id.* "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

B.   **Jurisdictional Facts**

1.   *Johnson-Blanco*

The following facts regarding Johnson-Blanco are uncontroverted, or, where disagreement exists, resolved in Plaintiff's favor.  *Ranza*, 793 F.3d at 1068.

Johnson-Blanco became chair of Network's board of directors in June 2018.  (Doc. 25 at 18 ¶ 5.)  In September 2018, Johnson-Blanco, alongside the unanimous board, decided to hire Plaintiff as Executive Director.  (*Id.* at 18 ¶ 7.)  As chair, Johnson-Blanco "was responsible for negotiating the precise terms" of Plaintiff's permanent employment agreement, and she discussed the terms of Plaintiff's compensation with the other board members.  (*Id.*)  Johnson-Blanco and the other board members set Plaintiff's duties as Executive Director, including day-to-day and special duties.  (*Id.* at 20 ¶ 20.)

In October 2018, Johnson-Blanco, alongside Tars, called Plaintiff to negotiate the terms of Plaintiff's employment contract.  (*Id.* at 18 ¶ 8.)  After the phone call, Johnson-Blanco promised to draft a written contract reflecting the parties' agreement on the terms of Plaintiff's permanent employment.  (*Id.* at 18 ¶ 9.)

In December 2018, Johnson-Blanco called Plaintiff to apologize for not providing a written contract and told Plaintiff that the board of directors would announce Plaintiff's appointment as permanent Executive Director the next day.  (*Id.* at 18 ¶ 10.)  Beginning in January 2019, instead of providing the written contract memorializing Plaintiff's permanent employment status, Johnson-Blanco ordered that Plaintiff be paid according to the prior IC Agreement.  (*Id.* at 19 ¶¶ 12-13.)  Johnson-Blanco did not provide a written permanent employment contract through the first half of 2019, and then in June 2019 she sent Plaintiff an email attaching an "offer letter."  (*Id.* at 19 ¶¶ 14-15.)  However, the terms set forth in this "offer letter" were different from the terms that Johnson-Blanco and Plaintiff had discussed in October 2018.  (*Id.* at 19 ¶ 15.)  Plaintiff sent an email to Johnson-Blanco stating that the terms were different, but Johnson-Blanco never responded to this email.  (*Id.*)

On November 22, 2019, Johnson-Blanco voted alongside the other board members

to terminate Plaintiff's employment.  (*Id.* at 20 ¶ 19.)  Johnson-Blanco sent the resulting termination letter.  (*Id.*)

Johnson-Blanco permanently resides in Maryland and resided there at all relevant times.  (Doc. 21-2 ¶ 7.)  Johnson-Blanco did not reside in Arizona at any relevant time and did not perform her duties as a board member in Arizona.  (*Id.* ¶¶ 8-9.)  She does not own any real estate or other property in Arizona, has not visited Arizona to engage in business or meet with Plaintiff, and is not a party to any contract with Plaintiff.  (*Id.* ¶¶ 10-12.)  Johnson-Blanco has not conducted any business with Plaintiff outside the scope of her duties with Network, and her communications with Plaintiff were undertaken solely in her capacity as chair of Network's board.  (*Id.* ¶¶ 13-14.)  Johnson-Blanco conducts her duties as a board member by email and telephone, and her communications with Plaintiff have primarily been by these methods, except for a few in-person meetings held outside Arizona. (*Id.* ¶¶ 6, 15.)

### 2.   *Tars*

The following facts regarding Tars are uncontroverted, or, where disagreement exists, resolved in Plaintiff's favor.  *Ranza*, 793 F.3d at 1068.

Tars became vice-chair of Network's board of directors in June 2018.  (Doc. 25 at 18 ¶ 5.)  Tars was also a member of Network's Executive Director search committee, and in that role, Tars recommended to Network's board that Plaintiff be hired.  (*Id.* at 18 ¶ 6.)  In September 2018, Tars, alongside the unanimous board, decided to hire Plaintiff as Executive Director.  (*Id.* at 18 ¶ 7.)  Tars discussed the terms of Plaintiff's compensation with the other board members.  (*Id.*)  Tars and the other board members set Plaintiff's duties as Executive Director, including day-to-day and special duties.  (*Id.* at 20 ¶ 20.)  In October 2018, Tars, alongside Johnson-Blanco, called Plaintiff to negotiate the terms of Plaintiff's employment contract.  (*Id.* at 18 ¶ 8.)

On November 22, 2019, Tars voted alongside the other board members to terminate Plaintiff's employment.  (*Id.* at 20 ¶ 19.)  Tars "pressured another board member" to appear at the vote so the board would have a quorum.  (*Id.*)  Throughout Plaintiff's time with

Network, Tars never discussed Network's employment offer with Plaintiff one-on-one, and he never signed or transmitted an offer of employment from Network to Plaintiff.  (Doc. 21-1 ¶¶ 14-15.)

Tars permanently resides in Pennsylvania and resided there at all relevant times.  (*Id.* ¶ 7.)  Tars did not reside in Arizona at any relevant time and did not perform his duties as a board member in Arizona.  (*Id.* ¶¶ 8-9.)  He does not own any real estate or other property in Arizona, has not visited Arizona to engage in business or meet with Plaintiff, and is not a party to any contract with Plaintiff.  (*Id.* ¶¶ 10-12.)  Tars has not conducted any business with Plaintiff outside the scope of his duties with Network.  (*Id.* ¶ 13.)  Tars conducts his duties as a board member by email and telephone, and his communications with Plaintiff have been exclusively through these methods.  (*Id.* ¶¶ 6, 16.)

### 3.   *Crooms-Robinson*

The following facts regarding Crooms-Robinson are uncontroverted, or, where disagreement exists, resolved in Plaintiff's favor.  *Ranza*, 793 F.3d at 1068.

Crooms-Robinson became treasurer of Network's board of directors in June 2018.  (Doc. 45-1 ¶ 5.)  Crooms-Robinson was also a member of Network's Executive Director search committee, and in that role, she recommended to Network's board that Plaintiff be hired.  (*Id.* ¶ 6.)  In September 2018, Crooms-Robinson, alongside the unanimous board, decided to hire Plaintiff as Executive Director.  (*Id.* ¶ 7.)  Crooms-Robinson discussed the terms of Plaintiff's compensation with the other board members.  (*Id.*)  Crooms-Robinson and the other board members set Plaintiff's duties as Executive Director, including day-to-day and special duties.  (*Id.* ¶ 26.)

As Network's treasurer, Crooms-Robinson bore the primary responsibility for determining whether Plaintiff used Network's funds appropriately.  (*Id.* ¶ 17.)  In February 2019, Crooms-Robinson approved of Plaintiff's use of the Expensify app to keep track of business expenses.  (*Id.* ¶ 19.)  Crooms-Robinson also approved of expenses even when Plaintiff submitted documentation than a month after the expenses were incurred.  (*Id.* ¶ 20.)

At a June 2019 board meeting, Crooms-Robinson advocated that Network not provide Plaintiff with a written contract memorializing the terms of her permanent employment, arguing that giving Plaintiff a contract might be a mistake and that Plaintiff "needed them more than they needed" her.  (*Id.* ¶ 13.)

On November 19, 2019, Plaintiff submitted receipts and Expensify records to the board for Crooms-Robinson's approval, but Crooms-Robinson determined that these expenses were not valid business expenses and informed other board members of her conclusion.  (*Id.* ¶¶ 22-23.)

On November 22, 2019, Crooms-Robinson seconded Tars's motion to terminate Plaintiff's employment and then voted in favor of termination.  (*Id.* ¶ 24.)

Crooms-Robinson permanently resides in the District of Columbia and resided there at all relevant times.  (Doc. 40-1 ¶ 7.)  Crooms-Robinson did not reside in Arizona at any relevant time and did not perform her duties as a board member in Arizona.  (*Id.* ¶¶ 8-9.) She does not own any real estate or other property in Arizona, has not visited Arizona to engage in business or meet with Plaintiff, and is not a party to any contract with Plaintiff. (*Id.* ¶¶ 10-12.)  Crooms-Robinson has not conducted any business with Plaintiff outside the scope of her duties with Network.  (*Id.* ¶ 13.)  Crooms-Robinson conducts her duties as a board member by email and telephone, and her communications with Plaintiff have primarily been by these methods, except for a few in-person meetings held outside Arizona. (*Id.* ¶¶ 6, 15.)

C.    **Analysis**

1.    *Purposeful Availment And Purposeful Direction*

As noted, the first prong of the test for specific personal jurisdiction involves an assessment of whether each defendant purposefully directed his activities toward the forum state or purposefully availed himself of the privilege of conducting activities there.  *Morrill,* 873 F.3d at 1142.  Courts "generally apply the purposeful availment test when the underlying claims arise from a contract, and the purposeful direction test when they arise from alleged tortious conduct."  *Id.*

Here, the complaint asserts four claims: (1) wrongful termination, (2) breach of the implied covenant of good faith and fair dealing, (3) breach of contract, and (4) negligent misrepresentation. (Doc. 11 ¶¶ 31-54.) Counts One and Four sound in tort while Counts Two and Three sound in contract.

### a.   *Purposeful Availment*

As for the contract-based claims, it is important to note that none of the Board Members is a party to the IC Agreements or to Plaintiff's alleged employment agreement. (Docs. 21-3, 21-4, 21-5.) Instead, Network—which does not contest jurisdiction—is Plaintiff's sole contractual counterparty. The Ninth Circuit's recent decisions in *In re Boon Global Limited*, 923 F.3d 643 (9th Cir. 2019), and *Global Commodities Trading Group, Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101 (9th Cir. 2020), are instructive in evaluating whether specific personal jurisdiction exists over individual corporate officers for contract-based claims in this circumstance.

In *Boon Global*, a district court in California granted a motion to compel a company (Parkridge) and its CEO (Dobson) to participate in arbitration. *Id.* at 649. In reaching this conclusion, the court determined that Dobson was subject to personal jurisdiction in California because he had, in his capacity as Parkridge's CEO, signed the underlying contract that gave rise to the action. *Id.* at 649. *See also id.* at 651 ("Dobson signed the Agreement . . . specifically as CEO of Parkridge, a corporation subject to California's jurisdiction through the Agreement. The district court—with no further analysis—found that signature sufficient to exercise jurisdiction over Dobson personally."). In the ensuing mandamus action, the Ninth Circuit held that, to the extent Dobson was being sued under a contract theory, he was not subject to personal jurisdiction in California because he was sued solely based on his performance of an official duty on behalf of his employer. *Id.* at 651 ("If the claim is for breach of contract, Dobson would lack sufficient contacts with California solely because he signed the Agreement in his capacity as Parkridge's CEO."). In contrast, the Ninth Circuit held that, to the extent Dobson was being sued under a tort theory, he was potentially subject to personal jurisdiction because, "[f]or claims sounding

in tort, a corporate officer can be subject to jurisdiction based on his own sufficient individual contacts with the forum." 923 F.3d at 652. This is because "[c]orporate officers can be liable for corporate actions where they are the guiding spirit behind the wrongful conduct, or the central figure in the challenged corporate activity." *Id.* at 651 (internal quotation marks omitted).

The Ninth Circuit revisited the question of personal jurisdiction over corporate officers in a contract action in *Global Commodities*. The plaintiff and defendant corporation had a history of large-scale agricultural commodities contracts and, due to unforeseen circumstances, the defendant corporation fell behind on payments under two of these contracts. 972 F.3d at 1104-05. The defendant corporation acknowledged its obligation to satisfy the debt in a memorandum of understanding, promissory note, and personal guaranty. *Id.* at 1105. One of the corporate defendant officers signed the memorandum of understanding as "Owner and Legal Representative" of the defendant corporation and both corporate officer defendants executed the personal guaranty, designating one of them as a surety of the promissory note. *Id.* The plaintiff brought suit after the corporation defaulted on the memorandum and note and neither of the corporate officers made payment under the guaranty. *Id.* at 1106. The district court dismissed for lack of personal jurisdiction, reasoning, *inter alia*, that the visits made by the corporate officers to the forum did not weigh in favor of jurisdiction because the visits "dealt with the underlying commodities contracts, not the subsequently executed memorandum, note, and guaranty." *Id.* The Ninth Circuit reversed, holding "that the district court had personal jurisdiction over both the corporate and individual defendants." *Id.* at 1104. The court "emphasized that courts must evaluate the parties' entire course of dealing, not solely the particular contract or tortious conduct giving rise to this claim, when assessing whether a defendant has minimum contacts with a forum." *Id.* at 1108. The court first concluded that personal jurisdiction existed over the corporate defendant because the "district court erred by considering the memorandum, note, and guaranty in isolation, ignoring the business reality in which they were embedded," which involved "a lengthy and ongoing

course of dealing." *Id.* The court then turned to the officers and concluded that, under the circumstances, "exercise of specific jurisdiction over employees based on actions they took on behalf of a corporation" was appropriate. *Id.* at 1109. The court reasoned that the officers' status as corporate employees "does not foreclose personal jurisdiction . . . [but] also does not guarantee it." *Id.* Instead of imputing the corporation's forum contacts to each officer, the court assessed "whether each individual had minimum contacts with the forum such that the exercise of jurisdiction over that individual would comport with traditional notions of fair play and substantial justice." *Id.* The court concluded that the exercise of personal jurisdiction over the officers was appropriate because they "met with [plaintiff's] employees in the forum state to negotiate the commodities transactions at issue . . . . [and] had previously traveled to California on multiple occasions as part of the ongoing business relationship" between the companies. *Id.* at 1110. These contacts alone were "sufficient" to support personal jurisdiction. *Id.* Additionally, the personal guaranty "may [have] provide[d] an independent basis for personal jurisdiction" because by signing this document the officers "interject[ed]" themselves into the transaction. *Id.*

*Boon Global* and *Global Commodities* support the conclusion that this Court lacks specific personal jurisdiction over the Board Members with respect to Counts Two and Three of Plaintiff's complaint, which sound in contract. As an initial matter, there is no suggestion that the Board Members personally guaranteed the underlying contracts or otherwise engaged in any conduct that strayed outside their official capacity as board members of Network. In this respect, this case is closer to *Boon Global*, where personal jurisdiction pertaining to any contract-based claims was lacking, than it is to *Global Commodities*.

Nor are the Board Members' individual contacts with Arizona, while acting on behalf of Network, sufficient to support the exercise of personal jurisdiction over them. Even when all conflicts are resolved in Plaintiff's favor, the evidence merely shows that the Board Members carried out certain duties on behalf of Network, a Georgia-based entity, from their respective residences in Maryland, Washington, D.C., and Pennsylvania. They

never physically visited Arizona.  The absence of such visits provides a significant difference between this case and *Global Commodities*, where the corporate officers' "multiple" visits to the forum state (and meetings with the plaintiff's representatives while in the forum state) provided the foundation for the Ninth Circuit's finding of jurisdiction.

At most, Plaintiff has shown that the underlying contracts (which the Board Members helped negotiate and then terminate from afar) envisioned that Plaintiff would perform her employment duties primarily while located in Arizona.  But the Ninth Circuit has specifically cautioned that "the fact that a contract envisions one party discharging his obligations in the forum state cannot, standing alone, justify the exercise of jurisdiction" over a defendant, even if that defendant is (unlike the Board Members here) a "party to the contract." *Picot v. Weston*, 780 F.3d 1206, 1213 (9th Cir. 2015).  Indeed, even if the Board Members had physically entered Arizona, that may have been insufficient to establish jurisdiction.  In *Picot*, the Ninth Circuit concluded there was no personal jurisdiction in California over a defendant who was party to a disputed oral agreement and who, pursuant to responsibilities under that agreement, visited the state two times, for around two weeks each, to assist the plaintiffs with marketing presentations. *Id.*  It is hard to imagine, then, how nonparties to an agreement who never visited the forum state and whose own responsibilities were not tied to the forum except through Plaintiff could be subject to personal jurisdiction there. *Walden v. Fiore*, 571 U.S. 277, 286 (2014) ("To be sure, a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties.  But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction.").  And the law in the Ninth Circuit is clear—phone calls, emails, and similar forms of communication with a plaintiff in the forum state "simply do not qualify as purposeful activity invoking the benefits and protection of the [forum] state." *Peterson v. Kennedy*, 771 F.2d 1244, 1262 (9th Cir. 1985) (alteration in original) (internal quotation marks omitted).  *See also Morrill*, 873 F.3d at 1144 ("Any links to Arizona, which included Defendants' communications with Plaintiffs by telephone and email . . . , occurred only because it

happened to be where Plaintiffs resided.").

It is also significant that Plaintiff, who bears the burden of proof, has not alleged that the Board Members affirmatively reached out to her to recruit her for the Executive Director position while she was living in Arizona.  Her complaint (Doc. 11), Network's answer and counterclaims (Doc. 12), and the parties' declarations (Doc. 21-1 [Tars]; Doc. 21-2 [Johnson-Blanco]; Doc. 25 at 17-21 [Plaintiff]; Doc. 40-1 [Crooms-Robinson]; Doc. 45-1 [Plaintiff]) are all silent on this point.[2]  Many other courts, when evaluating whether an employer is subject to personal jurisdiction for workplace-related claims in the state where a telecommuting employee resides, have identified the presence or absence of affirmative recruitment efforts within the forum state as a relevant factor.  *Compare Fields v. Sickle Cell Disease Ass'n of Am., Inc.*, 376 F. Supp. 3d 647, 652-54 (E.D.N.C. 2018) (granting motion to dismiss for lack of personal jurisdiction, in case involving workplace discrimination claims against Maryland-based company by employee who telecommuted from North Carolina, because the employer "never held meetings in North Carolina," "no employees traveled to North Carolina to work with plaintiff," and "Plaintiff initiated contact with defendant by inquiring about possible employment" and thus "Plaintiff's choice to complete her work in North Carolina for her own reasons is a unilateral decision that cannot be fairly attributed to the defendant as an attempt to avail itself of the privileges of conducting business in North Carolina")[3] *with Hall v. Rag-O-Rama, LLC*, 359 F. Supp.

---

[2]  The closest any party comes to addressing this point is Network, which alleges that "[i]n late 2017/early 2018, [Network] was transitioning from its prior Executive Director.  [Network] and [Plaintiff] discussed her serving as [Network's] interim or acting Executive Director until [Network] could find a permanent replacement Executive Director."  (Doc. 12 at 14 ¶ 11.)  Not only does this allegation fail to specify who initiated the discussions, but it does not specifically identify any of the Board Members as participating in those discussions.

[3]  *See also Klinge v. KBL Assocs., LLC*, 2020 WL 3415877, *1, *6 (W.D. Tex. 2020) (no personal jurisdiction over workplace-related claims asserted against Tennessee-based corporate officer by employee who telecommuted from Texas, even though the officer knew "that her decisions would cause harm to [the employee] in Texas," because the officer had "never traveled to Texas for reasons related to . . . Plaintiff's employment" and "there is no indication that [the individual officer], as opposed to [the employer], was in any way involved in choosing to employ Plaintiff, knowing he was in Texas"); *Perry v. Nat'l Ass'n of Home Builders of U.S.*, 2020 WL 5759766, *5 (D. Md. 2020) (granting motion to dismiss for lack of personal jurisdiction, in case involving wrongful termination claim against Washington D.C.-based company by employee who telecommuted from Maryland,

3d 499, 503, 507 (E.D. Ky. 2019) (denying motion to dismiss for lack of personal jurisdiction, in case involving workplace-related claims against Ohio-based company by employee who telecommuted from Kentucky, in part because the company's CEO "actively recruited her" by "initiat[ing] phone calls to her in Kentucky requesting that she rejoin Rag-O-Rama" and "it can hardly be denied that the recruitment and hire of a Kentucky executive-level employee to work almost exclusively in Kentucky qualifies as 'transacting any business in this commonwealth'") (citation omitted).

Plaintiff's remaining arguments concerning purposeful availment lack merit. Plaintiff cites *Calder v. Jones*, 465 U.S. 783 (1984), for the proposition that the Board Members' status as agents or employees of Network doesn't "insulate[] them from jurisdiction." (Doc. 25 at 6; Doc. 45 at 7.) But *Calder* was a tort case involving a claim for libel, which involves a different analysis. Additionally, although the Board Members' status as corporate employees doesn't "insulate" them from jurisdiction, it also doesn't inexorably subject them to jurisdiction. *Global Commodities*, 972 F.3d at 1109. As discussed above, the jurisdictional analysis requires a careful assessment of the Board Members' individual contacts with the forum state. Here, that analysis shows that the Board Members didn't "purposefully avail[] [themselves] of the privilege of conducting activities in [Arizona], thereby invoking the benefits and protections of its laws." *Morrill*, 873 F.3d at 1141. Plaintiff also contends that *Roth v. Garcia Marquez*, 942 F.2d 617 (9th Cir. 1982), supports her position. (Doc. 25 at 6; Doc. 45 at 7.) But *Roth* didn't involve a breach-of-contract claim being asserted against a corporate employee based solely on that employee's performance of official duties on behalf of his employer.[4]

---

because "[i]n remote-work cases . . . a defendant's mere knowledge that an employee happens to reside in the forum state and conduct some work from home does not constitute purposeful availment" and the employee "has not alleged that [the employer] recruited her for her job because she resided in Maryland, or even with knowledge of that fact"); *Pushor v. Mount Washington Observatory, Inc.*, 2018 WL 3487579, *6-7 (D. Me. 2018) (granting motion to dismiss for lack of personal jurisdiction, in case involving workplace-related claim against New Hampshire-based company by employee who telecommuted from Maine, in part because "[a]lthough [the employee] bears the burden of establishing purposeful availment, he offers scant evidence about . . . how the [the employer] recruited [him]" and "[the employer] did not initiate the arrangement but merely acquiesced to it").

[4]     *Roth* is also distinguishable for other reasons. There, in "a very close call," the

Accordingly, the Board Members are not subject to personal jurisdiction in Arizona for purposes of Counts Two and Three of Plaintiff's complaint.

b.   *Purposeful Direction*

This leaves Counts One and Four, with sound in tort and therefore trigger the "purposeful direction" test.   Purposeful direction requires the defendant to have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Morrill*, 873 F.3d at 1142 (internal quotation marks omitted).   "'[R]andom, fortuitous, or attenuated contacts' are insufficient to create the requisite connection with the forum." *Id.* (quoting *Burger King*, 471 U.S. at 475).

As for the first component of the purposeful direction test, "[t]he meaning of the term 'intentional act' in our jurisdictional analysis is essentially the same as in the context of intentional torts; namely, the defendant must act with the 'intent to perform an actual, physical act in the real world.'"   *Picot*, 780 F.3d at 1214 (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 806 (9th Cir. 2004)).   Here, the Board Members' intentional acts are their remote communications with Plaintiff regarding the terms and existence of her employment relationship with Network, their raising of concerns over her reimbursement requests, and their ultimate votes to terminate her employment relationship with Network.

Next, the "express aiming" component of the purposeful direction test looks to whether the allegedly tortious conduct was "expressly aimed" at the forum.   *Id.*   This

Ninth Circuit determined that because the defendant entered into a contract where "most of the future of the contract would have centered on the forum," the purposeful availment standard was met.   *Id.* at 622.   Unlike in this case, the defendant had actually visited the forum and conducted some business with the plaintiff there (although the court found this minimal physical presence did not weigh in favor of jurisdiction).   *Id.* at 621-22.   And, more fundamentally, the logic of *Roth*—involving a contract to produce a film which necessarily would involve large amounts of work being done in California—does not extend neatly to an employment agreement where the employee performs substantially all of her duties in the forum state but the employer is based in a different state and its directors live elsewhere and perform all of their duties outside the forum state.   *Id.* at 622.   Therefore, the "economic reality" of the employment agreements at issue in this case does not weigh in favor of a finding of personal jurisdiction in Arizona over the Board Members.

inquiry is fact-specific, but the Court is guided by the principle it "must focus on the defendant's contacts with the forum state, not the defendant's contacts with a resident of the forum." *Id.* Notably, "the plaintiff cannot be the only link between the defendant and the forum." *Walden*, 571 U.S. at 285. Here, Plaintiff is the only such link. This is insufficient, because "a tort must involve the forum state itself, and not just have some effect on a party who resides there." *Morrill*, 873 F.3d at 1145.

The final component of the purposeful direction tests requires that the injury suffered by the plaintiff be "tethered" to the forum state in some "meaningful way." *Picot*, 780 F.3d at 1215. The "potential foreseeability of some incidental harm" to Plaintiff in Arizona is, on its own, insufficient to establish purposeful direction. *Morrill*, 873 F.3d at 1145. Here, there is nothing to suggest a meaningful connection between Arizona and Plaintiff's injuries. Her alleged injury has occurred in Arizona because she happened to live in Arizona, but this injury is "entirely personal to h[er] and would follow h[er] wherever she might choose to live or travel." *Picot*, 780 F.3d at 1215. Plaintiff asserts that the Board Members' conduct violated Arizona employment law (Doc. 11 ¶¶ 20-23, 31), but "[t]he involvement of Arizona [law] [i]s solely a by-product of Plaintiff['s] residence" and is therefore insufficient to confer personal jurisdiction. *Morrill*, 873 F.3d at 1145.

Plaintiff therefore fails to meet her burden under either the purposeful availment or purposeful direction tests.

2. *Arising Out Of Or Relating To Defendants' Forum-Related Activities*

For similar reasons, Plaintiff has not met her burden as to the second prong of the personal jurisdiction inquiry—whether her claims arise out of or relate to the Board Members' forum-related activities. As with the purposeful direction analysis, the "proper lens" for this analysis is "whether the *defendant's* actions connect him to the *forum*." *Walden*, 571 U.S. at 289. "[T]he plaintiff cannot be the only link between the defendant and the forum." *Id.* at 285. Because the Board Members' forum-related activities consist solely of phone calls and emails with Plaintiff regarding her employment status, as well as decisions made outside the forum that would affect Plaintiff, the Board Members' only link

to the forum is Plaintiff.

Thus Plaintiff has also failed to meet her burden on the second prong. Because Plaintiff is required to meet her burden on both prongs, *Morrill*, 873 F.3d at 1142, the Court does not have personal jurisdiction over Johnson-Blanco, Tars, or Crooms-Robinson.[5]

II.    Plaintiff's Motion To Dismiss Network's Indemnity Counterclaim

Network has asserted several counterclaims against Plaintiff, including a counterclaim for contractual indemnity. (Doc. 12 at 20-21 ¶¶ 53-62.) Specifically, Network alleges that Plaintiff "took certain actions regarding various [Network] employees" during her tenure as Executive Director that "were directly contrary to the direction she was given by the Board." (*Id.* at 18 ¶¶ 40-41.) According to Network, these unspecified actions caused certain unspecified Network employees to "assert[] certain claims against [Network], including claims alleging violation of certain employment laws." (*Id.* at 18-19 ¶ 42.) Network alleges these other lawsuits caused it to suffer damages. (*Id.* at 19 ¶ 43.) And Network alleges that Plaintiff is contractually obligated to provide indemnification for those damages because her IC Agreements contained an indemnification clause that provides as follows:

> [Plaintiff] shall indemnify, defend and hold the Network harmless from any and all costs, claims, losses and/or damages, of whatever kind and nature, arising from, out of or in connection with the performance by [Plaintiff] of its obligations under this Agreement, including but not limited to reasonable attorneys' fees incurred by the Network in defending itself from any and all such claims.

(Doc. 12 at 16 ¶ 21.)

Plaintiff now moves to dismiss Network's counterclaim to the extent it seeks

---

[5]    The Board Members include, in their respective dismissal motions, conclusory requests for an order establishing their right to attorneys' fees under A.R.S. § 12-341.01. (Doc. 21 at 13; Doc. 40 at 11.) These requests are denied without prejudice. The Board Members may, within 14 days of entry of judgment in this action, file a renewed fee request. *See, e.g., Edwards v. Vemma Nutrition*, 2019 WL 2173673, *8 (D. Ariz. 2019) (granting motion to dismiss but denying without prejudice a request for attorneys' fees under A.R.S. § 12-341.01 that was "[e]mbedded" within the motion because it was premature and insufficiently detailed); *Graham-Miller v. Nationstar Mortgage LLC*, 2012 WL 2368494, *5 (D. Ariz. 2012) ("[I]f Defendants wish to be awarded attorneys' fees under section 12–341.01, they must file a separate motion that complies with Local Rule 54.2, setting out the reasons this Court should exercise its discretion to award fees.").

indemnification for damages arising from the other lawsuits.  (Doc. 15.)  Plaintiff advances three grounds for dismissal: (1) failure to allege sufficient facts to support the counterclaim, (2) unenforceability as a matter of Arizona public policy, and (3) lack of supplemental jurisdiction.  (*Id.*)  As explained below, the Court agrees with Plaintiff's first theory but not the others.  The Court therefore grants Plaintiff's motion to dismiss but also grants Network leave to amend.

### A.    **Subject Matter Jurisdiction**

As a threshold matter, the Court must assure itself that it has subject matter jurisdiction over the indemnity counterclaim.  Network asserts that subject matter jurisdiction arises under 28 U.S.C. § 1367(a), which provides for supplemental jurisdiction.  (Doc. 12 at 13 ¶ 6.)  Plaintiff disagrees, arguing that supplemental jurisdiction under § 1367(a) is lacking because (a) Network has failed to establish that the counterclaim is "so related" to Plaintiff's claims "that they form part of the same case or controversy" as required under § 1367(a) and (b) Network has failed to establish that the amount in controversy exceeds $75,000.  (Doc. 15 at 11-15.)

"A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may attack either the allegations of the complaint as insufficient to confer upon the court subject matter jurisdiction, or the existence of subject matter jurisdiction in fact."  *Ader v. SimonMed Imaging Inc.*, 324 F. Supp. 3d 1045, 1048 (D. Ariz. 2018) (internal quotation marks omitted).  "Where the jurisdictional issue is separable from the merits of the case, the judge may consider the evidence presented with respect to the jurisdictional issue and rule on that issue, resolving factual disputes if necessary."  *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).  "The party asserting jurisdiction has the burden of proving all jurisdictional facts."  *Indus. Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir. 1990).

28 U.S.C. § 1367(a) provides that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that

they form part of the same case or controversy under Article III of the United States Constitution." "Section 1367 applies to both state-law claims brought by a plaintiff and to state-law counterclaims brought by a defendant." *Nalan v. Access Fin., Inc.*, 2020 WL 6270945, *2 (N.D. Cal. 2020). Counterclaims are part of the same case or controversy when they "derive from a common nucleus of operative fact and are such that a plaintiff would ordinarily be expected to try them in one judicial proceeding." *Trs. of Constr. Indus. & Laborers Health & Welfare Tr. v. Desert Valley Landscape & Maint., Inc.*, 333 F.3d 923, 925 (9th Cir. 2003) (internal quotation marks omitted).

"Rule 13 of the Federal Rules of Civil Procedure governs the pleading requirements of counterclaims, and provides that a counterclaim may be either compulsory or permissive." *Nalan*, 2020 WL 6270945 at *2. A counterclaim is compulsory if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim" and "does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a)(1). A permissive counterclaim is "any claim that is not compulsory." Fed. R. Civ. P. 13(b).

In deciding whether a claim is compulsory, the phrase "transaction or occurrence" is "read broadly." *Pochiro v. Prudential Ins. Co.*, 827 F.2d 1246, 1252 (9th Cir. 1987). The Ninth Circuit applies the "logical relationship test" to determine whether the claim is compulsory. *In re Pinkstaff*, 974 F.2d 113, 115 (9th Cir. 1992). The logical relationship test "analyze[s] whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Pochiro*, 827 F.2d at 1249 (internal quotation marks omitted). "A logical relationship exists when the counterclaim arises from the same aggregate set of operative facts as the initial claim, in that the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights otherwise dormant in the defendant." *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1196 (9th Cir. 2005) (internal quotation marks omitted).

It is well established that if the logical relationship test is satisfied and a

counterclaim is therefore compulsory, the "common nucleus of operative facts" requirement is met and § 1367(a) confers jurisdiction. *Ader*, 324 F. Supp. 3d at 1051. There is some uncertainty, however, about whether § 1367(a) also extends jurisdiction over permissive counterclaims under the right circumstances, given that the "case or controversy" language of § 1367 "appears to be broad enough to encompass some permissive counterclaims." *Campos v. W. Dental Servs., Inc.*, 404 F. Supp. 2d 1164, 1168 (N.D. Cal. 2005). *See also Nalan*, 2020 WL 6270945 at *4 ("The Ninth Circuit has not definitively ruled on the question of whether supplemental jurisdiction under § 1367 can cover permissive counterclaims. However, at least two circuits have held that a federal court may exercise supplemental jurisdiction over certain permissive counterclaims.").

The Court need not wade into this debate here because Network's indemnity counterclaim "arises from the same aggregate set of operative facts as the initial claim," *Pegasus Gold*, 394 F.3d at 1196, and is thus compulsory. The first cause of action in Plaintiff's complaint is entitled "Wrongful Termination—Retaliation." (Doc. 11 ¶¶ 31-34.) It alleges that Network terminated Plaintiff not for legitimate reasons, but in retaliation for her complaints about being misclassified. (*Id.*) Network disputes this claim, arguing that it actually terminated Plaintiff for non-retaliatory reasons including Plaintiff's "ineffective management style." (Doc. 12 at 6 ¶ 26, 17 ¶ 31.) And as noted, in its indemnity counterclaim, Network more specifically alleges that while Plaintiff was working as Executive Director, she took improper actions that led other employees to assert claims against Network. (*Id.* at 18-19 ¶¶ 40-43.) This counterclaim arises from the same aggregate set of operative facts as Plaintiff's claim for wrongful termination. The facts arose during the same time period and involve Plaintiff's performance and management style as Executive Director.

*Ader*, on which Plaintiff relies, is distinguishable. There, the court concluded that an employee's retaliation claim and a counterclaim involving that employee's alleged self-dealing did not have a significant relationship. *Ader*, 324 F. Supp. 3d at 1051. Notably, the counterclaimant only became aware of the plaintiff's alleged self-dealing after the

challenged termination decision and after the plaintiff's complaint had been filed.  *Id.* at 1048.  The court reasoned that "the two sets of claims overlap only insofar as each arises from [the parties'] employment relationship."  *Id.* at 1051.  Here, however, the claims are not only overlapping because of Plaintiff and Network's employment relationship.  As Executive Director, Plaintiff's management and treatment of employees is squarely at issue in determining the propriety of her termination, which forms the crux of her retaliation claim.  This is unlike *Ader*, where the plaintiff's termination did not and could not have been related to the self-dealing, because the counterclaimants' awareness of the self-dealing only arose in the months after the plaintiff filed his complaint and was terminated.  *Id.* at 1048.  Further, in *Ader*, the counterclaimant tried to establish supplemental jurisdiction by arguing that its counterclaims would "rely in large part on the same evidence as its affirmative defenses," which the court found improper.  *Id.* at 1051-52 (internal quotation marks omitted).  Here, Plaintiff's claims and Network's counterclaim will rely on the same evidence—among other things, evidence regarding the basis for Plaintiff's termination, whether the IC Agreement containing the indemnification provision was the operative agreement at relevant times, and whether either party breached the operative agreement.  In sum, the "essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit."  *Pochiro*, 827 F.2d at 1249.  *Cf. Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 714 (9th Cir. 2001) (finding the "same transactional nucleus of facts" for *res judicata* purposes where "the additional allegations of discrimination [were] related to the same set of facts as the allegations in plaintiffs' 1995 complaint for wrongful discharge, and . . . the two cases could have conveniently been tried together") (second alteration in original) (internal quotation marks omitted).

Finally, there is no merit to Plaintiff's argument that subject matter jurisdiction is lacking because Network's "counterclaims do not satisfy 28 U.S.C. § 1332's amount-in-controversy requirement of more than $75,000."  (Doc. 15 at 14.)  As discussed, the Court has subject matter jurisdiction over this compulsory counterclaim pursuant to § 1367(a).

There is no amount-in-controversy requirement in this circumstance. *See, e.g., 1021018 Alberta, Ltd. v. Integraclick, LLC*, 2010 WL 2293206, *2 (M.D. Fla. 2010) ("JTM argues that the Counterclaim does not allege sufficient facts to establish that the amount in controversy is over $75,000 . . . . [This] argument fails, because Clickbooth's breach of contract claim is compulsory."); 14A Arthur R. Miller, Federal Practice & Procedure § 3706 (4th ed., Oct. 2020 update) ("The easiest situation to analyze is one in which the plaintiff's claim meets all the requirements for federal jurisdiction . . . . Since a compulsory counterclaim almost certainly will fall within the supplemental jurisdiction of the federal courts as defined in [§ 1367(a)] and does not require an independent basis of federal subject matter jurisdiction, the district court may hear the counterclaim regardless of whether it also independently satisfies the amount in controversy requirement.") (footnotes omitted).

## B.  **Failure To State A Claim Upon Which Relief Can Be Granted**

### 1.  *Legal Standard*

"[T]o survive a motion to dismiss under Rule 12(b)(6), a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (internal quotation marks omitted). However, a complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. 662, 678 (alteration in original) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)). The court thus may dismiss based on "the absence of sufficient facts alleged under

a cognizable legal claim." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (internal quotation marks omitted).

### 2. *Insufficiency Of Factual Allegations*

Plaintiff argues that Network's indemnity counterclaim is supported only "by vague and conclusory allegations . . . without specifics or other factual enhancement." (Doc. 15 at 6.)  She argues that "[w]ithout more detail about the 'certain actions' that Dr. Gonzalez allegedly took, ['certain actions'] could include any action that Dr. Gonzalez ever took . . . ." (*Id.*)  Network responds that its factual allegations are sufficient on their own, and that, because it has provided Plaintiff's counsel with more detail about the underlying facts via email, Plaintiff has "fair notice" of the basis for the indemnity counterclaim.  (Doc. 22 at 6-7.)  Network asserts that it did not wish to provide more detailed information in a public filing but stands ready to do so once a protective order is in place.  (*Id.* at 7.)

Plaintiff's arguments are well taken.  Network alleges that Plaintiff "took certain actions regarding various . . . employees" and that "[s]ome of the actions . . . were directly contrary" to the Board's wishes, and that, as a result of these "certain actions," some former employees have brought "certain claims" against Network including claims based on "certain employment laws."  (Doc. 12 at 18-19 ¶¶ 40-42.)  These allegations amount to vague and "naked assertions" that are devoid of necessary "factual enhancement." *Iqbal*, 556 U.S. at 678-79.  Simply put, Network's allegations are too vague for Plaintiff or the Court to understand the basis for its indemnity counterclaim.

The Court understands why Network is reluctant to divulge the identities of the former employees who have brought claims against it, but the path forward is not to proceed on overly vague allegations.  Rather, as it has indicated it can do, Network must provide more factual enhancement regarding the specific actions taken by Plaintiff that led to the employment claims, how many employees have brought claims on the basis of Plaintiff's conduct, the number of such pending and resolved actions against Network, and other information demonstrating that Network's damages "arise from, out of or in connection with" Plaintiff's conduct during her time with Network.  (Doc. 12 at 16 ¶ 21.)

It is possible to do so without disclosing sensitive or confidential information about the employees' identities.

The Court acknowledges that Network has partly shared this information with Plaintiff and the Court in its response (Doc. 22 at 5), but "evidence outside the [counterclaim] . . . should not be considered in ruling on a motion to dismiss." *Arpin v. Santa Clara Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001). Therefore, Network's indemnity counterclaim is dismissed, but with leave to amend. Leave is appropriate because Network has indicated it has additional facts in its possession that can remedy the counterclaim's defects. (Doc. 22 at 7.) Further, as explained below, Plaintiff's remaining argument for dismissal is without merit.

### 3.   *Arizona Public Policy*

Plaintiff argues that enforcement of the indemnification provision in this instance would violate Arizona public policy. (Doc. 15 at 8-9.) According to Plaintiff, Network's willful wrongdoing forms the basis for the underlying lawsuits brought by former employees. (*Id.* at 10.) Plaintiff's theory is that "[b]ecause all of these claims require proving [Network] intentionally made a negative employment action against the [former employee] based on the [former employee's] protected status, any such claim would constitute 'willful wrongdoing' under Arizona law." (*Id.*) Plaintiff argues that indemnifying Network for such "willful wrongdoing" is barred by Arizona public policy. (*Id.* at 10-11.)

Network advances four arguments in response. First, Network contends the relevant IC Agreement is governed by Georgia law, not Arizona law. (Doc. 22 at 8.) Second, and alternatively, Network argues that Arizona public policy does not preclude the enforcement of the indemnification provision under these circumstances. (*Id.* at 8-9.) Third, and in a related vein, Network argues that Plaintiff's public policy theory is inconsistent with "an entire line of business liability insurance known as employment practices liability insurance." (*Id.* at 9.) Fourth, Network argues that Plaintiff's public policy argument is falsely premised on the notion that it seeks indemnification for its own wrongdoing when

1    it is actually seeking indemnification for Plaintiff's wrongdoing.  (*Id.*)

2         The Court agrees with Network's first argument and therefore does not reach the

3    others.  The IC Agreement contains the following provision: "This Agreement shall be

4    governed by and interpreted in accordance with the laws of the State of Georgia."  (Doc.

5    21-4 at 4 ¶ 11.)  Plaintiff makes no effort to explain how Arizona public policy could serve

6    as a valid defense under this circumstance.  Nor does Plaintiff suggest that Georgia's public

7    policy would bar enforcement of the IC Agreement's indemnification clause.[6]

8         Rather than address the merits of Network's invocation of Georgia law, Plaintiff

9    asks the Court to disregard Network's argument because (1) Network "failed to attach the

10   relevant agreement as an exhibit" and (2) Network "fail[ed] to mention that Georgia law

11   applies to the agreement" during the parties' pre-motion email correspondence.  (Doc. 24

12   at 4.)  These arguments lack merit.  First, it is well settled that, although courts generally

13   may not consider materials beyond the pleadings when ruling on a Rule 12(b)(6) motion,

14   courts may "consider unattached evidence on which the [counterclaim] 'necessarily relies'

15   if: (1) the [counterclaim] refers to the document; (2) the document is central to the

16   [counterclaim]; and (3) no party questions the authenticity of the document."  *United States*

17   *v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011).  All of these requirements are met

18   here with respect to the IC Agreement.  Network's counterclaim "necessarily relies" on the

19   IC Agreement because the counterclaim is premised on the indemnification provision

20   appearing within the IC Agreement.  (Doc. 12 at 16 ¶ 21.)  Further, the counterclaim

21   repeatedly refers to the IC Agreement, the IC Agreement is central to the counterclaim,

22   and no party questions the IC Agreement's authenticity.[7]  Second, Plaintiff is incorrect that

---

[6]      Neither party has provided briefing on whether enforcement of the indemnification provision is consistent with Georgia law, but the Court notes that Georgia "follow[s] the rule that the courts must exercise extreme caution in declaring a contract void as against public policy and should do so only in cases free from doubt."  *Precision Plan., Inc. v. Richmark Cmties., Inc.*, 679 S.E.2d 43, 45 (Ga. Ct. App. 2009) (quoting *Emory Univ. v. Porubiansky*, 282 S.E.2d 903, 904 (Ga. 1981)).

[7]      The IC Agreement was attached to Johnson-Blanco and Tars's motion to dismiss for lack of personal jurisdiction (Doc. 21-4), which was filed by Network's counsel on the same day as Network's response to Plaintiff's motion to dismiss (Doc. 22).  Plaintiff did not object to the Johnson-Blano/Tars submission or dispute its authenticity.

a party somehow forfeits its ability to raise meritorious arguments in response to a motion to dismiss by failing to raise those arguments during the pre-motion meet-and-confer process.  The case on which Plaintiff relies, *Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 895 n.8 (9th Cir. 2019), is distinguishable because it involved a non-movant's attempt to rely on evidence not properly before the court.

III.     Plaintiff's Motion To Permit Service On Maulik's Counsel

Although Plaintiff was eventually able to serve three of the four board member defendants, she has been unable to serve Maulik, who is believed to reside in Switzerland. Thus, Plaintiff moves for permission to serve Maulik via her counsel, a law firm located in Arizona.  (Doc. 46.)  Plaintiff has twice requested that counsel accept service on Maulik's behalf but twice been rejected.  (*Id.* at 5.)  Plaintiff has also attempted to serve Maulik at addresses in New York and Massachusetts and mailed a request for waiver of service to Maulik's presumed Switzerland address.  (*Id.* at 6.)  Plaintiff has also attempted to reach Maulik via email, with no success.  (*Id.*)  Plaintiff acknowledges that Maulik's Arizona counsel is not authorized as an agent to accept service on Maulik's behalf.  (*Id.* at 2-3.) Nevertheless, Plaintiff argues that Maulik's counsel may be served under Rule 4(f)(3) even if counsel is not an authorized agent.  (*Id.* at 3-6.)

Plaintiff's argument is unavailing.  Rule 4(f)(3) provides that "an individual . . . may be served at a place not within any judicial district of the United States . . . by any other means not prohibited by international agreement, as the court orders."  Here, the Court cannot authorize service on Maulik's counsel under Rule 4(f)(3) because this service method is "prohibited by an international agreement"—specifically, the Hague Convention, to which Switzerland is a signatory.  *See, e.g., Elobied v. Baylock*, 299 F.R.D. 105, 107-08 (E.D. Pa. 2014) (denying motion under Rule 4(f)(3) to permit service on Swiss resident via email because "[t]he United States and Switzerland are both current signatories to the Hague Convention" and the Hague Convention does "not permit international service of process upon individuals located in Switzerland other than by transmission of service through the Swiss Central Authority, as outlined in Hague Convention Articles 2 through

6."); *Jimena v. UBS AG Bank*, 2010 WL 2465333, \*4-9 (E.D. Cal. 2010) ("[D]irect mail to a Swiss resident is not an 'internationally agreed means' permitted by Rule 4(f) and the Hague Convention."). *See generally Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 705 (1988) ("[C]ompliance with the Convention is mandatory in all cases to which it applies . . . .").

*Rio Properties, Inc. v. Rio International Interlink*, 284 F.3d 1007 (9th Cir. 2002), on which Plaintiff relies, does not compel a different result.  There, the Ninth Circuit affirmed a district court's order under Rule 4(f)(3) authorizing service of process on a foreign entity via the entity's U.S.-based attorney and via email.  *Id.* at 1014-19.  Critically, the foreign entity in *Rio Properties* was not Swiss—it was Costa Rican.  *Id.* at 1012.  And in a footnote, the Ninth Circuit clarified that, although "[a] federal court would be prohibited from issuing a Rule 4(f)(3) order in contravention of an international agreement, including the Hague Convention," "the Hague Convention does not apply in this case because Costa Rica is not a signatory."  *Id.* at 1015 n.4.  Accordingly, *Rio Properties* does not suggest (and, if anything, rejects the notion) that it is permissible under Rule 4(f)(3) to authorize service upon a Swiss resident via the resident's U.S.-based counsel.

Finally, Plaintiff argues that, under *Schlunk*, the "Hague Service Convention does not apply when a party serves process on a foreign defendant's domestic 'agent.'" (Doc. 46 at 4.)   The obvious problem here is that Plaintiff admits that Maulik's Arizona counsel is *not* an authorized agent.  (*Id.* at 2-3.)  In *Schlunk*, the "agent" in question was the defendant's "domestic subsidiary which, under state law, is the foreign corporation's involuntary agent for service of process."  486 U.S. at 696.  Here, Plaintiff has not demonstrated that Maulik's counsel is her domestic agent or offered any other basis for disregarding the Hague Convention.

…

…

…

…

Accordingly,

**IT IS ORDERED** that:

1.      Johnson-Blanco and Tars's motion to dismiss for lack of personal jurisdiction (Doc. 21) is **granted**.

2.      Crooms-Robinson's motion to dismiss for lack of personal jurisdiction (Doc. 40) is **granted**.

3.      Plaintiff's motion to dismiss Network's indemnity counterclaim (Doc. 15) is **granted**.

4.      Plaintiff's motion to permit service via Maulik's counsel (Doc. 46) is **denied**.

5.      Network has 14 days from the date of this Order to file an amended pleading. Network shall, consistent with LRCiv 15.1(a), attach a redlined version of the pleading as an exhibit.

Dated this 11th day of January, 2021.

Dominic W. Lanza
United States District Judge