**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Rosalee Gonzalez, | No. CV-20-00757-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| US Human Rights Network, et al., | |
| Defendants. | |

Pending before the Court are cross-motions for summary judgment filed by Plaintiff/Counter-defendant Rosalee Gonzalez ("Dr. Gonzalez") and Defendant/Counterclaimant US Human Rights Network ("USHRN").  For the following reasons, Dr. Gonzalez's motion is denied and USHRN's motion is granted in part and denied in part.

## DISCUSSION

I.    Legal Standard

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The Court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference[s] in the nonmoving party's

favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125.

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

"[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be considered on its own merits," but the Court must consider all evidence submitted in support of both motions when separately reviewing the merits of each. *Fair Hous. Council*

*of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotation marks omitted).   For "the party with the burden of persuasion at trial" to succeed in obtaining summary judgment, it "must establish beyond controversy every essential element" of each claim on which summary judgment is sought.   *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).   The party without the burden of persuasion at trial is entitled to summary judgment where it establishes that the party with the burden of persuasion will be unable to prove at least one element of its claim in light of the undisputed facts.   *Celotex Corp.*, 477 U.S. at 322-23.   This distinction reflects that the burden is ultimately on the proponent of each claim to prove it.   *Id.* ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

II.    <u>Analysis</u>

Before addressing the parties' summary judgment arguments and the facts bearing on those arguments, it is helpful to provide some basic background details that are undisputed.

Between February 2018 and December 2018, Dr. Gonzalez served as USHRN's acting executive director.   This relationship was memorialized in a series of independent contractor agreements ("IC Agreements").   (Doc. 106-1 at 28-38.)

Much of the dispute in this case turns on the nature of Dr. Gonzalez's relationship with USHRN during 2019.   Dr. Gonzalez contends that, in late December 2018, she received and accepted an oral offer to become USHRN's permanent executive director. Thus, Dr. Gonzalez contends that her work for USHRN in 2019 was in the capacity of an employee, not an independent contractor.   USHRN, in contrast, contends that although it engaged in negotiations with Dr. Gonzalez about entering into an employment relationship,

1   an agreement was never reached, and thus Dr. Gonzalez remained an independent

2   contractor for purposes of her work in 2019.

3        Throughout 2019, Dr. Gonzalez periodically complained about USHRN's

4   classification of her as an independent contractor and USHRN's corresponding failure to

5   provide her with medical and other employee benefits.  Eventually, in late 2019, USHRN

6   terminated Dr. Gonzalez.  As discussed below, another dispute turns on whether Dr.

7   Gonzalez's complaints amounted to protected activity under Arizona's whistleblower

8   statutes and whether USHRN's decision to terminate her was wrongful because it was

9   motivated by those complaints.

10        Finally, a non-party USHRN employee who was terminated by Dr. Gonzalez in

11   mid-2019 subsequently asserted tort claims against USHRN related to the termination.  Yet

12   another dispute turns on whether Dr. Gonzalez must indemnify USHRN for the alleged

13   costs associated with defending and settling that former employee's claims.

14        With this background in mind, the Court now addresses the arguments raised in the

15   parties' cross-motions for summary judgment, which are grouped together by issue.

16        A.    **Count One: Wrongful Termination/Retaliation**

17             1.    Background

18        In Count One of the First Amended Complaint ("FAC"), Dr. Gonzalez asserts a

19   claim for "Wrongful Termination-Retaliation" in violation of A.R.S. § 23-

20   1501(A)(3)(c)(ii), which is also known as the Arizona Employment Protection Act

21   ("AEPA"), and/or under A.R.S. § 23-374.  (Doc. 11 ¶¶ 31-34.)  Dr. Gonzalez alleges that

22   USHRN terminated her "in retaliation for [her] whistleblowing and reporting that

23   [USHRN] violated various Arizona laws when [USHRN] illegally misclassified [her] as

24   an independent contractor and denying [her] benefits, including, but not limited to, earning

25   and using earned sick leave, payment of employee taxes, provision of worker's

26   compensation coverage, and payment of unemployment benefit contributions."  (*Id.* ¶ 32.)

27             …

28             …

2.     The Parties' Arguments

USHRN contends it is entitled to summary judgment on Count One for four reasons. (Doc. 106 at 11-15.)[1]  First, USHRN contends that Dr. Gonzalez did not engage in "protected activity" because (a) to the extent Count One arises under AEPA, that statute requires an employee to report that the employer was violating state law, but Dr. Gonzalez merely complained about "not receiving benefits" and did not tell anyone at USHRN that it was acting illegally under Arizona law; and (b) to the extent Count One arises under A.R.S. § 23-374, that statute only applies to retaliation for complaints related to sick time, but Dr. Gonzalez "was never denied sick pay and she never complained to USHRN regarding a sick pay law violation." (*Id.* at 11-13.)  Second, USHRN contends that Dr. Gonzalez cannot establish a causal connection between the alleged protected activity and the termination decision because "the evidence shows that USHRN repeatedly offered to make [her] an employee" throughout 2019, only for her to reject those offers. (*Id.* at 13-14.)  Third, USHRN contends it had six legitimate, non-retaliatory reasons for terminating Dr. Gonzalez: (1) her rejection of employment offers; (2) her mismanagement of subordinates; (3) her insubordination toward the USHRN board; (4) her failure to follow USHRN policies and the IC Agreements; (5) her alienation of key partner organizations; and (6) her failure to secure funding "for 2020 and beyond" and poor financial stewardship. (*Id.* at 4-6, 14.)  Fourth, USHRN contends that Dr. Gonzalez cannot establish these legitimate reasons were pretextual. (*Id.* at 14-15.)

Dr. Gonzalez opposes USHRN's motion with respect to Count One. (Doc. 116 at 7-12.)  First, Dr. Gonzalez contends that she made multiple disclosures that qualify as protected activity under the relevant statutes, including a disclosure to a member of the USHRN executive board in which she expressly raised her "lack of reclassification" as an employee and "the outstanding illegal status of this non-reclassification." (*Id.* at 7-8.)  Second, Dr. Gonzalez contends that USHRN's causation arguments lack merit because

---

[1]     Although USHRN also identifies, in a footnote (Doc. 106 at 11 n.3), another potential reason why Count One may fail—the lack of an employment relationship—it does not move for summary judgment on that ground.

USHRN erroneously seeks application of a "but-for" test, which is contrary to Arizona's "motivating factor" standard, and because the temporal proximity between her complaints and the termination decision is alone sufficient to create an issue of fact as to causation. (*Id.* at 8-9.)  Finally, as for the six purported legitimate, non-retaliatory reasons for her termination, Dr. Gonzalez argues that most are *post hoc* rationalizations that USHRN did not identify at the relevant time (which itself serves as evidence of pretext) and that the one contemporaneously offered justification—failure to secure future funding—is pretextual because, days before the announcement of the termination decision, she informed the board that she had achieved a 100% increase in funding from the previous year.  (*Id.* at 9-12.)

In reply, USHRN argues that the protected activity requirement is not satisfied here because Dr. Gonzalez's "assertions to [USHRN] that it could not continue paying her as a 1099 contractor is not a sufficient disclosure but is merely a general concern over [USHRN's] actions" (Doc. 123 at 6-7); that temporal proximity is lacking because Dr. Gonzalez reached out about her 1099 contractor status in February 2019 and was not terminated until nine months later (*id.* at 7-8); and that its reasons for termination have remained consistent and are not *post hoc* rationalizations (*id.* at 8-9).

### 3.   Analysis

Under A.R.S. § 23-1501(A)(3)(c)(ii), "[a]n employee has a claim against an employer for termination of employment" if:

> The employer has terminated the employment relationship of an employee in retaliation for . . . [t]he disclosure by the employee in a reasonable manner that the employee has information or a reasonable belief that the employer, or an employee of the employer, has violated, is violating or will violate the Constitution of Arizona or the statutes of this state to either the employer or a representative of the employer who the employee reasonably believes is in a managerial or supervisory position and has the authority to investigate the information provided by the employee and to take action to prevent further violations of the Constitution of Arizona or statutes of this state or an employee of a public body or political subdivision of this state or any agency of a public body or political subdivision.

*Id.*  Thus, to prevail on a claim under this provision of AEPA (which, in part, gives rise to

Dr. Gonzalez's claim in Count One), Dr. Gonzalez "must establish: (1) she had information or a reasonable belief that her employer or another employee had violated an Arizona statute or constitutional provision; (2) she disclosed the information or belief to an employer or a representative of the employer whom she reasonably believed was in a managerial or supervisory position and had the authority to investigate the information and take action to prevent further violations of the Arizona constitution or statutes; and (3) she was terminated because of the first two steps." *Denogean v. San Tan Behavioral Health Servs., LLC*, 2017 WL 4922035, *3 (D. Ariz. 2017). *See also Chen v. Cozzoli LLC*, 2022 WL 845190, *3 (D. Ariz. 2022) (same).

Meanwhile, A.R.S. § 23-374(B) provides that "[a]n employer shall not engage in retaliation or discriminate against an employee or former employee because the person has exercised rights protected under this article. Such rights include but are not limited to the right to request or use earned paid sick time pursuant to this article; the right to file a complaint with the commission or courts or inform any person about any employer's alleged violation of this article; the right to participate in an investigation, hearing or proceeding or cooperate with or assist the commission in its investigations of alleged violations of this article; and the right to inform any person of his or her potential rights under this article." *Id.* These protections also apply "to any person who mistakenly but in good faith alleges violations of this article." *Id.* § 23-374(D).

USHRN argues, and Dr. Gonzalez does not dispute, that even if Dr. Gonzalez establishes a prima facie case of wrongful termination under either of these statutes, USHRN may avoid liability by identifying a legitimate, non-retaliatory reason for the termination decision. *Whitmire v. Wal-Mart Stores Inc.*, 359 F. Supp. 3d 761, 799-800 & n.29 (D. Ariz. 2019) (citing *Czarny v. Hyatt Residential Mktg. Corp.*, 2018 WL 1190051 (Ariz. Ct. App. 2018)). If USHRN articulates such a reason, Dr. Gonzalez has the burden of showing the proffered reason is pretextual. *Id. See also Murar v. AutoNation Inc.*, 2021 WL 3912849, *4 (D. Ariz. 2021) ("The burden-shifting analysis established by [*McDonnell Douglas*] applies to AEPA retaliation claims at the summary judgment stage.

1   Under this framework, an employee has the initial burden of establishing a prima facie case

2   of retaliation.  If the employee establishes a prima facie case, the burden shifts to the

3   employer to articulate a legitimate nonretaliatory reason for termination.  If the employer

4   articulates such a reason, the plaintiff has the burden of showing the employer's alleged

5   reason is pretextual.") (citations omitted).

6                              i.   **Protected Activity**

7       USHRN contends that Dr. Gonzalez cannot establish she engaged in protected

8   activity because, although she may have complained about being misclassified as an

9   independent contractor and not receiving healthcare benefits, she never went further and

10  "notif[ied] USHRN that it was acting illegally."  (Doc. 106 at 12.)

11      This argument is belied by the record.  Dr. Gonzalez has submitted evidence that,

12  during a meeting with a member of USHRN's executive committee in or around June

13  2019,[2] she not only complained about "the lack of reclassification" but also raised "the

14  *outstanding illegal status* of this non-classification."  (Doc. 116-2 at 163, emphasis added.)

15  USHRN ignores this conversation in its reply, instead focusing on whether Dr. Gonzalez

16  expressly raised the issue of illegality during some of her other proffered examples of

17  protected activity.  Because a reasonable juror could construe Dr. Gonzalez's June 2019

18  conversation as an instance of protected activity under AEPA,[3] USHRN is not entitled to

19  summary judgment on Count One for the first reason identified in its motion.

20      The June 2019 conversation also provides important context when evaluating the

21  significance of an email that Dr. Gonzalez sent to the USHRN board on August 2, 2019.

22  In that email, Dr. Gonzalez began by stating: "I continue to be gravely concerned about the

23  lack of communication and no contract for me, as ED [executive director].  I remind you,

24

25  _____

    [2]      Although the date of the meeting is not entirely clear, Dr. Gonzalez testified that it
    occurred before, but seemingly around, June 8, 2019.  (Doc. 116-2 at 165.)

26  [3]      As noted, AEPA requires that the report be made to "a representative of the
    employer who the employee reasonably believes is in a managerial or supervisory position
27  and has the authority to investigate the information provided by the employee and to take
    action to prevent further violations."  A.R.S. § 23-1501(A)(3)(c)(ii).  USHRN does not
28  dispute that the executive committee member to whom Dr. Gonzalez made this report
    qualifies as such a representative.

under the current category of self-employment I have not had any right to vacation, personal or sick time in the last 19 months of employment and I sincerely want to exercise my right to rest soon.  I kindly ask for an update on this pressing matter."  (Doc. 106-1 at 253.)   Although, as USHRN correctly notes in its motion papers, this email did not expressly accuse USHRN of engaging in illegal conduct, a reasonable juror could construe this email as reiterating the complaints of illegality that Dr. Gonzalez had just raised two months earlier.   Indeed, the relevant passage began by stating that Dr. Gonzalez "continue[d] to be gravely concerned" about the matters at issue and ended by seeking "an update on this pressing matter."   Thus, construed in the light most favorable to Dr. Gonzalez, the August 2, 2019 email also qualifies as an instance of protected activity under AEPA.

ii.   **Causation**

Arizona courts, as well as federal courts interpreting Arizona law, have held that a plaintiff asserting an AEPA retaliation claim must "show that retaliation was a substantial (even if not the sole) motivating factor in the termination."  *Czarny*, 2018 WL 1190051 at *3.   Put another way, "[t]o prove this causal link, the employee must show that the employer's retaliatory motive played a part in the employment action."  *Whitmire*, 359 F. Supp. 3d at 798 (citations and internal quotation marks omitted).

Here, Dr. Gonzalez has presented evidence that she complained to an USHRN executive committee member in June 2019 about the "outstanding illegal status" of her classification as an independent contractor, reiterated this complaint in an email to the USHRN board on August 2, 2019, and was informed that she was being terminated one month later, during a phone call on September 4, 2019.[4]   Construed in the light most favorable to Dr. Gonzalez, a reasonable juror could infer a causal link between Dr. Gonzalez's reports of illegal conduct and the termination decision as a result of their

---

[4]    Although USHRN formally terminated Dr. Gonzalez on November 22, 2019 (Doc. 106-1 at 207 [termination letter]), Dr. Gonzalez was informed of the termination decision on September 4, 2019, during a phone call with two USHRN board members (Doc. 106-1, Exhs. 29, 30 [WhatsApp recording of call]).

temporal proximity.  *Murar*, 2021 WL 3912849 at *8 ("A causal link can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.") (citation omitted).  *Cf. Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004) ("The causal link between a protected activity and the alleged retaliatory action 'can be inferred from timing alone' when there is a close proximity between the two.  Here, . . . approximately seven weeks after Thomas first supported Perry's promotion, Miller informed Thomas that she was being placed on extended probation.  We have held that events occurring within similar intervals of time are sufficiently proximate to support an inference of causation.") (citations omitted).

The Court also disagrees with USHRN's contention, raised during oral argument, that causation is necessarily lacking because it made a formal written employment offer to Dr. Gonzalez in June 2019 that was identical to the oral offer she purportedly accepted in December 2018.  Putting aside the fact that there is a factual dispute over whether the later offer was identical—Dr. Gonzalez contends it was less favorable because it would have made her an at-will employee—it is unclear why the rejection of the June 2019 offer would, as a matter of law, break the causal chain.  Again, the chronology is that Dr. Gonzalez continued complaining about the purported illegality of her classification as an independent contractor in August 2019, which was several months after she rejected the June 2019 offer, and was terminated soon after making that complaint.  It is irrelevant, for purposes of whistleblower liability under § 23-1501(A)(3)(c)(ii), that her misclassification complaint in August 2019 may have been groundless from a legal perspective in light of her rejection of the June 2019 offer—all that matters is that she made the complaint, she reasonably believed it to be true, and she was terminated in short succession afterward.  *See generally Drottz v. Park Electrochemical Corp.*, 2013 WL 6157858, *17 (D. Ariz. 2013) ("An actual violation of the predicate statute need not occur.  Rather, the AEPA allows wrongful termination claims when an employee has a *reasonable* belief that the employer has violated, is violating, or will violate the Constitution of Arizona or the statutes of this state.") (citations and internal quotation marks omitted).  The Court acknowledges that

1    USHRN has identified various pieces of evidence (including the rejection of the June 2019

2    offer) that a reasonable factfinder could construe as eliminating any causal link between

3    Dr. Gonzalez's complaints and the termination decision, but the Court cannot resolve the

4    conflicting inferences raised by the parties' causation evidence at summary judgment.

5                iii.    **Legitimate, Non-Retaliatory Reason For Termination**

6         USHRN's next argument is that even if Dr. Gonzalez could establish a prima facie

7    case of wrongful termination, it would be entitled to summary judgment because it had six

8    legitimate, non-retaliatory reasons for the termination decision.

9         Some background details are necessary when evaluating this issue.  During a phone

10   call on September 4, 2019, two USHRN board members informed Dr. Gonzalez that the

11   board had decided to terminate her.  The partial audio recording of this phone call reveals

12   that the sole reason provided to Dr. Gonzalez for the termination decision was her failure

13   to secure "future funding" for USHRN.  (Doc. 106-1, Exhs. 29, 30.)  The recording also

14   reveals that, at various points during the call, Dr. Gonzalez suggested that litigation would

15   ensue as a result of the termination decision.  (*Id.*)

16        USHRN did not immediately terminate Dr. Gonzalez following this call.  Instead,

17   the board allowed her to continue serving as the executive director because, in the words

18   of USHRN's Rule 30(b)(6) designee, "we were hopeful that we would be able to work with

19   Dr. Gonzalez on a mutually agreed upon transition."  (Doc. 116-2 at 29-30.)   In the

20   meantime, various USHRN stakeholders reached out to the board in an effort to seek

21   reconsideration of the termination decision.  (Doc. 106-1 at 176 ["Since the conversation

22   with the Board about a change in Network leadership, Ms. Gonzalez has reached out to

23   some of you and some have subsequently reached out to the Board asking that we

24   reconsider our decision."].)

25        On October 31, 2019, a member of the USHRN board wrote an email to other board

26   members, various stakeholders, and Dr. Gonzalez in response to these reconsideration

27   requests.  (*Id.* at 176-77.)  The email explained that the reconsideration requests would be

28   denied because "a majority of the Board strongly believes that a different type of leadership

is needed at the helm of the Network at this time" and "we also strongly believe that we need new leadership to move the Network constructively beyond the present moment." (*Id.* at 176.)  Additionally, the email sought the recipients' assistance in "address[ing] the many challenges that the organization currently faces" and then used four bullet points to identify those challenges as: (1) "Breakdown in relationship between current board and Executive Director"; (2) "Spate of claims by former employees"; (3) "Lack of funding secured for 2020 and beyond"; and (4) "Fractured membership and stakeholder relationships." (*Id.*)

The next relevant development occurred on November 22, 2019, when USHRN formally terminated Dr. Gonzalez via a one-page termination letter.  (*Id.* at 207.)  This letter did not provide a basis for the termination decision.  (*Id.*)

Finally, during the discovery process in this case, USHRN's Rule 30(b)(6) designee was asked to identify the basis for the termination decision.  She testified that, although the four bullet points in the October 31, 2019 letter were "some of the reasons" for the termination decision, there were also two "additional reasons": (1) "Dr. Gonzalez not adhering to the processes within the Network, particularly pertaining to expenses"; and (2) "the financial stewardship of the organization."  (Doc. 116-2 at 30-31.)

In the tentative ruling issued before oral argument, the Court suggested that USHRN could not rely on all six of the justifications proffered by its Rule 30(b)(6) designee because it only raised one of those justifications (the "future funding" rationale) during the September 4, 2019 phone call in which Dr. Gonzalez was informed of the termination decision, which raised an inference that the later-identified justifications (made following a threat of litigation) were pretextual.  However, during oral argument, USHRN correctly noted that, under Ninth Circuit law, an inference of pretext does not arise simply because an employer has "changed its reasons over time" for an adverse employment action—instead, such an inference arises only when the later-provided justifications are "inconsistent or conflicting" with the earlier justifications or when there has been a "retraction" of the earlier justifications. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054,

1063 (9th Cir. 2002) (citations omitted).[5]  Here, none of the justifications provided by USHRN's Rule 30(b)(6) designee are inconsistent with the "future funding" justification articulated during the September 4, 2019 call or the justifications identified in the October 31, 2019 email.  Additionally, USHRN has consistently identified "future funding" as one of its justifications for the termination decision (meaning there has been no retraction).  Thus, the Court concludes—contrary to the conclusion in the tentative ruling—that all of the justifications identified by USHRN's Rule 30(b)(6) designee are fair game for purposes of assessing whether USHRN had a legitimate, non-retaliatory reason for the termination decision.

One further issue requires clarification before evaluating whether USHRN's proffered reasons are pretextual.  Dr. Gonzalez contends that the six justifications identified in USHRN's summary judgment brief are different from the justifications that USHRN's representatives previously identified.  (Doc. 116 at 9-10 [accusing USHRN of "omitting or altering" the justifications].)  The Court disagrees.  As noted, USHRN's Rule 30(b)(6) designee provided the following six reasons for the termination decision—(1) "Breakdown in relationship between current board and Executive Director"; (2) "Spate of claims by former employees"; (3) "Lack of funding secured for 2020 and beyond"; (4) "Fractured membership and stakeholder relationships"; (5) "not adhering to the processes within the Network, particularly pertaining to expenses"; and (6) "the financial stewardship of the organization." (Doc. 116-2 at 30-31, citing Doc. 106-1 at 176.)  Meanwhile, USHRN seeks

---

[5]      *See also Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1997) ("Nidds argues that summary judgment against his claims was improper because of Schindler's shifting explanations for the October 1992 layoff.  These alone, he insists, are enough to raise a genuine issue as to its discriminatory motives. . . .  However, the reasons given by Schindler are not incompatible, and therefore not properly described as 'shifting reasons.'"); *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733-34 (7th Cir. 2001) ("[Johnson] says that the alleged vacillation in Nordstrom's reasons for failing to promote her creates an issue of fact as to pretext. . . .  [But] pretext [is] demonstrated by not only shifting but also conflicting, and at times retracted, justifications for adverse treatment.  Here, Nordstrom simply supplemented its explanations in the context of EEOC charges and litigation; there has been no retraction of any of its reasons for failing to promote Johnson nor are any of its reasons inconsistent or conflicting.  Thus, Johnson has failed to demonstrate that Nordstrom's legitimate, nondiscriminatory reasons for failing to promote her to beauty director were pretextual.").

summary judgment based on the following six justifications: (1) rejection of employment offers; (2) mismanagement of subordinates; (3) insubordination toward the USHRN board; (4) failure to follow USHRN policies and the IC Agreements; (5) alienation of key partner organizations; and (6) failure to secure funding "for 2020 and beyond" and poor financial stewardship.  (Doc. 106 at 4-6, 14.)  Although the verbiage used in USHRN's brief may differ from the verbiage used by USHRN's Rule 30(b)(6) designee, the brief is functionally invoking the same justifications.   For example, Dr. Gonzalez's rejection of board's employment offers and alleged acts of insubordination (two of the justifications discussed in the brief) are simply examples of the alleged "Breakdown in relationship between current board and Executive Director" (one of the justifications identified in the October 31, 2019 email).  As for mismanagement of subordinates (brief), that is simply another way of referring to the alleged "Spate of claims by former employees" (October 31, 2019 email).  Similarly, failing to follow USHRN policies (brief) is simply another way of referring to "not adhering to the processes within the Network" (Rule 30(b)(6) testimony), and alienating key partner organizations (brief) is simply another way of referring to "Fractured membership and stakeholder relationships" (October 31, 2019 email).  Finally, the future funding and financial stewardship justifications in the brief are the same as the justifications offered in the September 4, 2019 call, the October 31, 2019 email, and the Rule 30(b)(6) testimony.

### iv.    **Pretext**

Because USHRN has proffered evidence that it had legitimate, nondiscriminatory reasons for the challenged termination decision, the burden shifts to Dr. Gonzalez to show the proffered reasons are pretextual.  *Coghlan v. Am. Seafoods Co. LLC*., 413 F.3d 1090, 1094 (9th Cir. 2005).  "A plaintiff may meet the burden to show pretext using either direct or circumstantial evidence.  Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption.  Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer.  Circumstantial evidence, in contrast, is evidence that requires an additional

inferential step to demonstrate discrimination.  It can take two forms.  First, the plaintiff can make an affirmative case that the employer is biased.  For example, statistical evidence is circumstantial evidence that could, if sufficiently probative, point to bias.  Second, the plaintiff can make his case negatively, by showing that the employer's proffered explanation for the adverse action is unworthy of credence." *Id.* at 1094-95 (cleaned up). "The distinction between direct and circumstantial evidence is crucial, because it controls the amount of evidence that the plaintiff must present in order to defeat the employer's motion for summary judgment.  Because direct evidence is so probative, the plaintiff need offer 'very little' direct evidence to raise a genuine issue of material fact.  But when the plaintiff relies on circumstantial evidence, that evidence must be 'specific and substantial' to defeat the employer's motion for summary judgment." *Id.* (citations omitted).  Here, because Dr. Gonzalez seeks to rely solely on circumstantial evidence of pretext—she attempts to show that USHRN's proffered reasons are unworthy of credence—the "specific and substantial" standard applies.  Additionally, because USHRN "has proffered more than one reason for the challenged action," Dr. Gonzalez "must address all of the employer's suggested reasons." *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004).

The Court begins with the one justification that USHRN has consistently advanced, which is Dr. Gonzalez's alleged failure to secure future funding.  Because one of Dr. Gonzalez's responsibilities as executive director was to oversee fundraising activities,[6] a failure in this area would easily qualify as a legitimate reason for her termination.

As for whether this justification was pretextual, the analysis is complicated by the fact that neither side's proffered evidence goes to the heart of the issue.  To support its position, USHRN proffers its financial reports for the years 2017, 2018, and 2019.  (Doc. 107-1 at 50-61.)  Although these reports reflect that USHRN's funding from "contributed

---

[6]     *See, e.g.*, Doc. 115-7 at 2 (identifying one of the "Executive Director Responsibilities" as "[c]reate and implement USHRN's annual fundraising strategy, ensuring a diversified funding base including foundations, individuals, and special events that will total at least $1.4M annually"); Doc. 115-8 at 3 (May 2019 email from Dr. Gonzalez, noting that "I've received feedback on various organizational concerns, including . . . downsizing our scope of work to focus on fundraising 2019").

support" decreased each year that Dr. Gonzalez was serving as executive director—there was a decrease of over $400,000 between 2017 and 2018 and a further decrease of around $30,000 between 2018 and 2019—they contain no information about USHRN's funding prospects for 2020 and beyond.  It is therefore difficult to see how the reports could be viewed as corroborating the "future funding" rationale for the termination decision.  Had USHRN's representatives stated during the September 4, 2019 phone call, or in the October 31, 2019 letter, that Dr. Gonzalez's *overall* fundraising struggles were the basis for the termination decision, the reports would support that position, but the representatives specifically stated that the concern was over "future funding" (call) and "[l]ack of funding secured for 2020 and beyond" (email).

Meanwhile, to support her position that the "future funding" rationale was pretextual, Dr. Gonzalez proffers evidence that on September 3, 2019, one day before the phone conversation announcing her termination, she sent an email to two USHRN board members that included the following: "Funding – We have doubled our funding from FJS (100k to 200k, 2020); our grant reports for Libra and Kellog are under review and we have asked for increased funding, yet we are waiting for renewal invitations.  I will provide a detailed update on his front."  (Doc. 116-3 at 50.)  The difficulty with this email, which was not apparent to the Court when drafting the tentative ruling but which USHRN pointed out during oral argument, is that it merely reflects that Dr. Gonzalez secured a $100,000 increase in future funding from one particular donor.  Such an increase says nothing about the overall funding picture for USHRN in 2020 and beyond—a donation of $200,000 would only be a fraction of USHRN's expected annual haul.  (Doc. 107-1 at 51, 55, 59 [between 2017 and 2019, USHRN's annual rate of "contributed support" ranged from over $320,000 to over $769,000];  Doc. 115-7 at 2 [fundraising efforts should generate "at least $1.4M annually"].)  Thus, the fact that one donor was planning to increase its 2020 donation from $100,000 to $200,000 does not, without more, show that Dr. Gonzalez was succeeding in securing future funding—it is a solitary data point that lacks significance

without other information.[7]

Because neither side's evidence on this point is particularly probative, the outcome is dictated by the burden of proof. As noted, it is Dr. Gonzalez's burden to show that USHRN's "future funding" rationale is pretextual. She must do so with specific and substantial evidence. Furthermore, it is not enough for Dr. Gonzalez to show that the rationale is assailable (*i.e.,* she had, in fact, done an adequate job of securing future funding). Instead, she must go further and show that USHRN didn't honestly believe its proffered reason. *See, e.g., Villiarimo*, 281 F.3d at 1063 ("In judging whether Aloha's proffered justifications were 'false,' it is not important whether they were *objectively* false (e.g., whether Villiarimo actually lied). Rather, courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless. As the district court correctly observed, Villiarimo presented no evidence that Aloha did not honestly believe its proffered reasons.") (citation and internal quotation marks omitted); *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered. We do not sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of the decision.") (citations omitted).

Dr. Gonzalez has not met that burden here. At most, there is evidence that USHRN's board members were aware that Dr. Gonzalez had succeeded in persuading one donor to increase its annual contribution from $100,000 to $200,000, which only represented a fraction of the overall expected budget. There is no evidence, let alone specific and substantial evidence, from which a reasonable juror could conclude that the USHRN board members lacked an honest belief in the "future funding" explanation they consistently provided as a justification for the termination decision.

Given this conclusion, little needs to be said about the additional justifications that

---

[7]     Dr. Gonzalez also argues that other board members should have provided more assistance with fundraising (Doc. 116 at 12), but this is at most an excuse she could offer in response to criticisms of fundraising struggles, not evidence that such criticisms are inaccurate or pretextual.

USHRN provided for the termination decision, but the Court notes that Dr. Gonzalez has also failed to show pretext with respect to the "spate of claims by former employees/mismanagement of subordinates" rationale.  As discussed in more detail in Part II.E below, the undisputed evidence shows that three USHRN employees filed grievances against Dr. Gonzalez in June 2019 raising claims of discrimination, retaliation, and/or improper discharge.  (Doc. 107-1 at 23-38.)  The Court has little trouble concluding that engaging in conduct that potentially exposes one's employer to tort litigation is a legitimate and non-discriminatory reason for termination.  *Cf. Rizzo v. PPL Serv. Corp.*, 2005 WL 913091, *10 (E.D. Pa. 2005) ("The reasons provided by PPL are that the Plaintiffs . . . could have exposed PPL to sexual harassment litigation.  Mr. Gorsky and Mr. Rizzo do not dispute that the reasons given are legitimate and non-discriminatory . . . .").  Dr. Gonzalez's only response is to accuse USHRN of changing its rationale to a focus on "grievances" rather than "legal claims," but this argument is unpersuasive and falls far short of a specific and substantial showing that the USHRN board members lacked an honest belief in this rationale.

For these reasons, and upon full consideration of the points raised during oral argument (which persuaded the Court to change its tentative ruling on the issue of pretext), USHRN's request for summary judgment on Count One is granted.

B.     **Counts Two And Three: Contract Claims**

1.     Background

Counts Two and Three of the FAC are both predicated on the notion that USHRN entered into an employment contract with Dr. Gonzalez.  (Doc. 11 ¶¶ 35-47.)  Count Two is a claim for breach of the implied covenant of good faith and fair dealing arising from that contract while Count Three is a claim for "breach of contract—failure to employ."  (*Id.*)

…

…

…

1           2.     The Parties' Arguments

2      Both sides move for summary judgment on Dr. Gonzalez's contract-based claims.

3           a.     **USHRN's Motion**

4      USHRN identifies one reason why it is entitled to summary judgment on these

5 claims—because they are barred by the statute of limitations.  (Doc. 106 at 8-9.)  According

6 to USHRN, both claims are subject to A.R.S. § 12-541(3)'s one-year statute of limitations

7 for employment contract claims; both accrued no later than January or February 2019,

8 which is when Dr. Gonzalez admitted she was aware that she was not receiving her

9 purported employment benefits and that USHRN was improperly paying her as a 1099

10 contractor; and both are therefore time-barred because Dr. Gonzalez did not file her

11 complaint until March 18, 2020.  (*Id.*)

12     In response, Dr. Gonzalez identifies three reasons why her contract claims should

13 not be considered time-barred.  (Doc. 116 at 5-7.)  First, Dr. Gonzalez contends that A.R.S.

14 § 12-541(3) applies only to "oral or written" employment contracts, whereas one of her

15 theories here is that an "implied" contract arose.  (*Id.*)  Second, and alternatively, Dr.

16 Gonzalez argues that because "Arizona law suspends and restarts the statute of limitations

17 when a contract informs the counterparty of its just obligation to perform the contract," and

18 here USHRN apologized in May 2019 for not treating her as an employee, that apology

19 restarted or at least "equitably tolled" the statute of limitations.  (*Id.*)  Third, and further

20 alternatively, Dr. Gonzalez argues that because USHRN owed her a "continuing duty" to

21 treat her as an employee and provide her employee benefits, a new breach-of-contract claim

22 "accrued each pay period, when [USHRN] failed to provide Dr. Gonzalez the

23 compensation due for her work during that period."  (*Id.*)

24     In reply, USHRN argues that Dr. Gonzalez provides "no support" for her theory that

25 implied-contract claims are not governed by A.R.S. § 12-541(3)'s statute of limitations;

26 that the one-year statute of limitations was not suspended or tolled by the purported

27 apology; and that the continuous violation doctrine is inapplicable here.  (Doc. 123 at 2-6.)

28           …

- 19 -

b. **Dr. Gonzalez's Motion**

Dr. Gonzalez argues that she is entitled to summary judgment on her contract-based claims because the undisputed evidence shows that, in December 2018, USHRN orally offered her a contract to serve as its executive director at an annual salary of $125,000 and she orally accepted that offer. (Doc. 108 at 7-9.) The proof of this oral contract, according to Dr. Gonzalez, includes the admission of USHRN's Rule 30(b)(6) representative that she "had accepted" the December 2018 contract offer; other admissions by USHRN representatives during their depositions in this case; various internal USHRN records that referred to her as an employee and/or didn't identify her as an independent contractor; USHRN's public announcement regarding the hiring decision; and USHRN's conduct during the subsequent attempts to memorialize the contract in writing. (*Id.*) Alternatively, Dr. Gonzalez argues that her "actual status as an employee created an implied contract." (*Id.* at 9-11.) In support of this argument, Dr. Gonzalez notes that USHRN's bylaws, as well as other internal records, identified her as the executive director and/or referred to her as an employee; that she was paid and otherwise treated as an employee in terms of payroll, the provision of a company-issued laptop and credit cards, and autonomy; and that she had the authority to enter into contracts and fire other employees on behalf of USHRN. (*Id.*) With this backdrop in mind, Dr. Gonzalez argues that all of her subsequent discussions with USHRN about memorializing her employment contract in writing were simply unsuccessful attempts by USHRN to modify the contract that had already come into effect. (*Id.* at 11-13.) Finally, Dr. Gonzalez argues she is entitled to recover two discrete categories of damages arising from the contractual breaches: (1) the value of the employee benefits that were improperly withheld from her; and (2) damages arising from the fact that, due to USHRN's conduct, she did not qualify for reduced payments under a federal loan forgiveness program for employees of public service organizations. (*Id.* at 13-15.)

In response, USHRN first argues that Dr. Gonzalez's contract-based claims fail for the reasons identified in USHRN's affirmative summary judgment motion—because they are time-barred. (Doc. 115 at 2, 8.) Alternatively, USHRN identifies various pieces of

evidence that suggest there was no oral or implied contract—including the testimony of its representatives, who asserted that Dr. Gonzalez rejected USHRN's contract offer (which only included a $100,000 annual salary) during December 2018; its custom and practice of only hiring executive directors via written contracts; contemporaneous internal correspondence and records reflecting that Dr. Gonzalez had rejected any contract offer; and the fact that Dr. Gonzalez continued working in 2019 under the terms of her IC Agreements—and argues that these pieces of evidence create a dispute of fact that precludes summary judgment. (*Id.* at 3-5, 9-14.) In a related vein, USHRN argues that the supposed admissions identified in Dr. Gonzalez's motion are not really admissions. (*Id.* at 5-6.) Alternatively, USHRN argues that even accepting Dr. Gonzalez's account of the December 2018 conversations, "the only terms [she] alleges were agreed to are the salary and employment benefits," whereas "[n]o other terms such as severance, at-will or non-at-will status, or other obligations were allegedly part of [the] oral agreement," and thus the terms were too uncertain and ambiguous to create an enforceable contract. (*Id.* at 10.) Finally, USHRN argues that Dr. Gonzalez's damages related to her student loans are too speculative to be recoverable. (*Id.* at 6-7, 13-14.)

In reply, Dr. Gonzalez argues: (1) USHRN initially admitted during its Rule 30(b)(6) deposition that it had agreed to an oral contract in December 2018, only for its Rule 30(b)(6) representative to change her testimony after speaking with counsel during a break; (2) the documentary evidence "blatantly contradicts" USHRN's position that the oral offer in December 2018 was for a $100,000 salary; (3) the parties' agreement was sufficiently definite because, under Arizona law, "an employee's general description of duties and compensation are sufficiently definite to form a contract"; (4) USHRN's "business practice theory" is unavailing because it at most reflects USHRN's "secret belief," never articulated to her, that employment contracts should be in writing; (5) USHRN has failed to contest "the existence of an employment relationship"; (6) her contract claims are not time-barred, for the reasons stated in her response to USHRN's motion; and (7) her student loan damages are not speculative. (Doc. 122 at 3-9.)

3. Analysis

a. **Statute Of Limitations**

Under Arizona law, a one-year statute of limitations applies to a claim for "breach of an oral or written employment contract including contract actions based on employee handbooks or policy manuals that do not specify a time period in which to bring an action." A.R.S. § 12-541(3).  Both sides agree, however, that the accrual of such a claim is subject to the discovery rule, meaning the limitations period does not begin running until "the plaintiff knows or, in the exercise of reasonable diligence, should know the facts underlying the cause." *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 898 P.2d 964, 966 (Ariz. 1995).  "The burden of establishing that the discovery rule applies to delay the statute of limitations rest[s] on plaintiff."  *Logerquist v. Danforth*, 932 P.2d 281, 284 (Ariz. Ct. App. 1996).

When being deposed in this case, Dr. Gonzalez admitted that, by no later than January 2019, she was aware that USHRN was violating the terms of her purported employment contract (because she was not receiving employee benefits and was being paid as a 1099 contractor).  For example, during one exchange, Dr. Gonzalez agreed when asked to confirm that "you knew from January of 2019 until November of 2019 . . . that you weren't receiving healthcare . . . [w]hich you contend was one of the things that was agreed to in the oral agreement."  (Doc. 106-1 at 68.)  Later, Dr. Gonzalez confirmed that "this breach . . . occurred sometime prior to August 2019," clarified that the moment of breach was when USHRN "failed to follow up with reclassifying [her] correctly as an employee" and failed to pay her "all benefits afforded to full-time employees, like healthcare, et cetera, 401(k), et cetera," and then admitted that the "breach occurred starting in January of 2019." (*Id.* at 220-21.)  Thus, under a straightforward application of the discovery rule, Dr. Gonzalez's contract claims accrued in January 2019.  Because Dr. Gonzalez did not initiate this action until March 2020 (Doc. 1-3), which was one than one year after the accrual date, those claims would appear to be time-barred.

Dr. Gonzalez advances several theories in an attempt to avoid this time bar.  First,

1    she argues that because A.R.S. § 12-541(3)'s one-year statute of limitations only applies

2    to claims for breach of an "oral or written" employment contract, but she is advancing a

3    claim for breach of an "implied" employment contract, the one-year limitations period is

4    inapplicable.

5        Although this variant of an *expressio unius* argument has surface appeal, it fails

6    upon close scrutiny. *Cf. Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) ("The

7    force of any negative implication . . . depends on context. We have long held that the

8    *expressio unius* canon does not apply unless it is fair to suppose that Congress considered

9    the unnamed possibility and meant to say no to it, and that the canon can be overcome by

10   contrary indications that adopting a particular rule or statute was probably not meant to

11   signal any exclusion."). As an initial matter, the title of A.R.S. § 12-541 is "Malicious

12   prosecution; false imprisonment; libel or slander; seduction or breach of promise of

13   marriage; *breach of employment contract*; wrongful termination; liability created by

14   statute; one year limitation." *Id.* (emphasis added). Although not dispositive, the italicized

15   text suggests the Arizona legislature intended for the one-year limitations period to apply

16   to all employment contracts, including implied employment contracts. *See generally State*

17   *v. Shepler*, 684 P.2d 924, 925 (Ariz. Ct. App. 1984) ("[I]t is proper to consider the title in

18   attempting to interpret the legislature's intent.").

19       In a related vein, although § 12-541(3) doesn't expressly include "implied"

20   employment contracts in the list of employment contracts governed by a one-year

21   limitations period, the Court is skeptical that this omission is a signal that the legislature

22   intended for such contracts to be governed by a different limitations period. As noted,

23   § 12-541(3) provides that the one-year limitations period applies to a claim for "breach of

24   an oral or written employment contract *including contract actions based on employee*

25   *handbooks or policy manuals that do not specify a time period in which to bring an action*."

26   *Id.* (emphasis added). The italicized language suggests the legislature was using the phrase

27   "oral or written employment contract" to broadly encompass all employment contracts,

28   even ones arising from implication from other writings (which is essentially Dr. Gonzalez's

implied-contract theory here).

Another relevant consideration is that Dr. Gonzalez has not identified—and the Court is unaware of—any separate statutory provision creating a different limitations period for claims based on the breach of an implied employment contract.  This, too, suggests the legislature didn't intend to exclude such claims from § 12-541(3)'s scope.  The Court can discern no comprehensible policy reason why the legislature would subject claims arising from oral and written employment contacts to a very short one-year limitations period while applying a longer limitations period to claims arising from implied employment contracts.

Finally, it is also notable that, in the somewhat analogous context of claims for breach of the implied covenant of good faith and fair dealing, Arizona courts have held that such claims should be governed by the same limitations period as a claim for breach of the underlying written or oral contract from which the implied covenant arose.  *See, e.g., Wood Bros., Inc. v. Western Techs., Inc.*, 2019 WL 7176319, *3-4 (Ariz. Ct. App. 2019) (citing *Woodward v. Chirco Const. Co., Inc.*, 687 P.2d 1269 (Ariz. 1984)).  By the same logic, a claim for breach of an implied employment contract should be governed by the same limitations period as a claim for breach of an oral or written employment contract.

Dr. Gonzalez's next theory is that the running of the limitations period was suspended in May 2019 when USHRN informed her "of its just obligation to perform the contract."  (Doc. 116 at 5.)  The relevant exchange began on May 11, 2019, when Dr. Gonzalez wrote an email to the USHRN board.  (Doc. 116-3 at 52-53.)  In the introductory paragraph of this email, Dr. Gonzalez identified "two outstanding issues that demand your immediate attention."  (*Id.* at 53.)  The first outstanding issue was "my contract," and Dr. Gonzalez elaborated in the body of the email that "I'd appreciate [i]f you could resolve[] on your end your position on a contract for me, which remains outstanding.  This is impacting me and we can't continue like this."  (*Id.*)  Two days later, on May 13, 2019, a USHRN board member responded in relevant part as follows: "I am also trying to get up to speed about [the] process of moving you from a contract position to an employee status.

My apologies that this is taking longer than I expected as I have many urgent matters and deadlines that [I] have been juggling during the last weeks.  I am not available tomorrow until 9 p.m. EST.  Are others available to talk then?"  (*Id.*)  At the bottom of the email, the USHRN board member wrote her name.  (*Id.*)

In Arizona, "[w]hen an action is barred by limitation no acknowledgment of the justness of the claim made subsequent to the time it became due shall be admitted in evidence to take the action out of the operation of the law, unless the acknowledgment is in writing and signed by the party to be charged thereby."  A.R.S. § 12-508.  Thus, "[f]or an acknowledgment of an indebtedness to effectively remove the bar of the limitation[s] period [1] the acknowledgment must be in writing; [2] it must be signed by the party to be charged; [3] it must sufficiently identify the obligation referred to, though it need not specify the exact amount or nature of the debt; [4] it must contain a promise, express or implied, to pay the indebtedness; and [5] it must contain, directly or impliedly, an expression by the debtor of the 'justness' of the debt."  *Freeman v. Wilson*, 485 P.2d 1161, 1165-66 (Ariz. 1971) (brackets added).  Here, USHRN doesn't dispute that the first two elements are satisfied and challenges only the final three.  (Doc. 123 at 3-4.)  In a nutshell, USHRN argues that the May 13, 2019 email was too vague and equivocal to qualify as an acknowledgement of indebtedness because it didn't reference any existing obligations (let alone acknowledge the justness of those obligations), was "consistent with USHRN's position that the parties had still not reached an agreement on employment terms," and made "no promise" to provide a contract or employee benefits.  (*Id.*)

Although USHRN has proffered one plausible interpretation of the May 13, 2019 email, this is not the only plausible interpretation.  Construed in the light most favorable to Dr. Gonzalez, a reasonable juror could interpret the May 13, 2019 email as identifying the debt owed to Dr. Gonzalez (*i.e.,* to classify her as an employee and pay her employee benefits, which it had purportedly agreed to do as of January 2019), as promising to make good on this debt, and as acknowledging the justness of the obligation.  Indeed, the May 13, 2019 email did not quarrel with Dr. Gonzalez's assertion that her contract status was

an "outstanding issue" that demanded "immediate attention" and instead suggested that the "process of moving you from a contract position to an employee status" would occur soon. It is true, as USHRN notes, that the email did not contain any "discussion of agreed upon salary, benefits, or otherwise" (Doc. 123 at 4), but this level of specificity is not required under Arizona law—although the acknowledgement "must sufficiently identify the obligation referred to, . . . it need not specify the exact amount or nature of the debt." *Freeman*, 485 P.2d at 1165.  Moreover, there is circumstantial evidence from which a reasonable juror could infer that the May 13, 2019 email was referring to the debt arising from the purported employment contract.  A few weeks after this email was sent, USHRN sent an offer letter to Dr. Gonzalez that was backdated to "January 2019."  (Doc. 108-3 at 84 [actual letter]; Doc. 108-1 at 23 [discussion of backdating].)  A reasonable juror could view this as consistent with the notion that the May 13, 2019 email was a promise to make good on the outstanding debt owed to Dr. Gonzalez since January 2019.

Next, although the May 13, 2019 email did not expressly promise to make good on the obligation to Dr. Gonzalez, Arizona law provides that the promise may be "express or implied." *Freeman*, 485 P.2d at 1166. *See also De Anza Land & Leisure Corp. v. Raineri*, 669 P.2d 1339, 1344 (Ariz. Ct. App. 1983) ("We also note that the promise to pay may be implied.").  Here, a reasonable juror could interpret the board member's reference to the "process of moving you from a contract position to an employee status"—which was described as a *fait accompli*, not as a step conditioned on future negotiations and agreements—as an implicit promise to make good on the indebtedness.  *Cf. Bainum v. Roundy*, 521 P.2d 633, 634 (Ariz. Ct. App. 1974) ("[Appellants] contend . . . the statement in the letter 'I am sure we can reach an understanding in a satisfactory arrangement for the repayment of my note with you' constitutes no more than a conditional promise to pay.  We do not agree. . . .  The use of the words 'reach an understanding in a satisfactory arrangement' do not detract from his willingness to pay the debt—they merely reflect the fact that Mr. Bainum would have to work out the Terms of repayment.  The trial court did not err in finding that the March 25th letter constituted a sufficient acknowledgment to

remove the bar of the statute of limitations.").

Similarly, although the May 13, 2019 email did not expressly affirm the justness of the obligation, "[t]he 'justness' of a debt may be express or it may be implied from the words used in acknowledging the debt. . . . [N]o precise form of words need be used to constitute a legally sufficient acknowledgment." *Freeman*, 485 P.2d at 1166 (citations omitted). Whether the May 13, 2019 email constituted a sufficient acknowledgement of the justness of the debt presents a disputed issue of fact that cannot be resolved at summary judgment.

Finally, and in a related vein, the Court disagrees with USHRN's contention, raised during oral argument, that the applicability of A.R.S. § 12-508 must be resolved by the Court as a matter of law at this juncture of the case. Although Arizona law on this point is not a model of clarity, at least one Arizona Supreme Court decision suggests that when, as here, the evidence concerning a written acknowledgement of debt could be reasonably construed as raising conflicting inferences, the issue should be reserved for the jury. *Steinfeld v. Marteny*, 10 P.2d 367, 370 (Ariz. 1932) ("There is no conflict in the testimony on this issue . . . whether these taken all together amounted to the acknowledgment . . . to take the indebtedness out of the operation of the statute. Where the evidence on that point is in writing, as here, we think it is the duty of the court to determine the question rather than to submit it to the jury. . . . *If the evidence on that point were in conflict, or if from it there could reasonably be drawn different inferences, we think it would have been a matter for the jury*; but such was not the case.") (emphasis added).

Given these conclusions, it is unnecessary to resolve Dr. Gonzalez's final statute-of-limitations argument, which relates to the continuous violation theory. USHRN is not entitled to summary judgment on Counts Two and Three.

### b.    **Contract Formation**

Dr. Gonzalez contends she is affirmatively entitled to summary judgment on her contract claims because the undisputed evidence shows that an employment contract (either oral or implied) was formed in December 2018 and then breached, resulting in damages.

On the issue of contract formation, Dr. Gonzalez places heavy emphasis on the supposed admissions of USHRN's Rule 30(b) designee and other representatives during their depositions in this case.  The Court has carefully reviewed the cited deposition excerpts and disagrees with Dr. Gonzalez's interpretation.  Although some of the statements may seem like admissions when viewed in isolation, they could also be interpreted by a reasonable juror, when viewed in the light most favorable to USHRN, as consistent with USHRN's overall litigation position that the discussions in December 2018 were mere unsuccessful attempts to reach an agreement.

For example, Dr. Gonzalez sets out, in a lengthy block quote, the supposed admission of USHRN's Rule 30(b)(6) designee that Dr. Gonzalez "had verbally accepted" an offer in late 2018 to become the permanent executive director.  (Doc. 108 at 7.) However, the surrounding context suggests the witness was merely agreeing that USHRN had agreed to make a public announcement that Dr. Gonzalez had received and accepted an employment offer because such an announcement would "reduce concerns from funders."  (Doc. 108-1 at 22-23.)  This is quite different from an admission that Dr. Gonzalez had, in fact, verbally accepted an oral contract offer.  In a similar vein, the Rule 30(b)(6) designee's statement during a different portion of the deposition that "Dr. Gonzalez accepted the permanent position" was immediately followed by the clarification that this was "[s]ubject to . . . the terms of the offer letter." (*Id.* at 17.)  Once again, this is consistent with USHRN's litigation position that the discussions in December 2018 never resulted in the formation of a contract because the parties remained at an impasse over certain unresolved terms.

At bottom, the parties have presenting conflicting evidence about the substance of the oral contract discussions in late 2018.  Dr. Gonzalez testified that "[t]here was an offer, and then later came multiple calls coordinating what should become the announcement and . . . the oral agreement to make a transition from interim to executive director" and that there was "an agreement in place between the two sides as to salary and benefits."  (Doc. 115-2 at 4-5.)  In contrast, USHRN's witnesses testified that any agreement was "subject

to an offer letter being signed." (Doc. 115-4 at 10. *See also id.* at 13-15 [explaining that Dr. Gonzalez "never accepted the terms of the offer" and "rejected the terms of the employment" by refusing to sign the offer letter].)  This sort of factual dispute cannot be resolved at summary judgment.  This is true even though Dr. Gonzalez has identified various pieces of circumstantial evidence—including internal documents describing her as an employee, the public announcement of her hiring, and the parties' subsequent course of conduct—that tend to corroborate her position.  As courts have noted in other contexts, "the volume of corroborating evidence relates only to the credibility and weight of the evidence, which are issues for *the jury*."  *Nnadozie v. Genesis HealthCare Corp.*, 730 F.App'x 151, 160 (4th Cir. 2018) (citation and internal quotation marks omitted).

Finally, and for similar reasons, Dr. Gonzalez is not entitled to summary judgment on Counts Two and Three based on her theory that an implied employment contract necessarily arose.  "In deciding whether a worker is an employee" or an independent contractor, Arizona courts "look to the totality of the circumstances."  *Santiago v. Phoenix Newspapers, Inc.*, 794 P.2d 138, 143 (Ariz. 1990).  "[T]he fact finder must evaluate a number of criteria," including (1) the extent of control exercised by the master over details of the work and the degree of supervision; (2) the distinct nature of the worker's business; (3) specialization or skilled occupation; (4) materials and place of work; (5) duration of employment; (6) method of payment; (7) relationship of work done to the regular business of the employer; and (8) belief of the parties.  *Id.* at 142.  Although Dr. Gonzalez identifies evidence suggesting that some of these factors support her position that she was an employee, a reasonable juror could conclude that certain other factors—including the method of payment (no withholding for employee benefits) and the belief of the parties (the USHRN representatives' testimony that they did not consider Dr. Gonzalez to be an employee)—support USHRN's position.  Weighing and resolving these disputed factors is a role for the factfinder at trial.

For these reasons, Dr. Gonzalez is not entitled to summary judgment on Counts Two

1    and Three.[8]

2        C.     **Count Four: Negligent Misrepresentation**

3          1.   Background

4    In Count Four of the FAC, Dr. Gonzalez asserts a claim for negligent

5    misrepresentation. (Doc. 11 ¶¶ 48-54.) The crux of this claim is that when USHRN

6    "provided Dr. Gonzalez a revised Executive Director offer letter with contract terms that

7    represented Dr. Gonzalez was an employee," USHRN "falsely represented" that it

8    "considered and would treat Dr. Gonzalez as an employee." (*Id.*) The FAC alleges that

9    Dr. Gonzalez justifiably relied on this misrepresentation to her detriment by, *inter alia*,

10   "withdrawing from consideration for another executive director position." (*Id.*)

11         2.   The Parties' Arguments

12   USHRN argues that Count Four fails as a matter of law because, like the

13   unsuccessful negligent representation claim in *Bowman v. Honeywell Int'l, Inc*., 438 F.

14   App'x 613 (9th Cir. 2011), it is premised on "a non-actionable promise of future conduct—

15   *i.e.*, that USHRN would make her an employee." (Doc. 106 at 10.) Alternatively, USHRN

16   argues that Dr. Gonzalez cannot establish justifiable reliance because she knew beginning

17   in January 2019 "that she was being paid as a 1099 contractor in the identical manner under

18   the IC Agreements, and she was not receiving employee benefits such as healthcare." (*Id.*

19   at 10-11.)

20   In response, Dr. Gonzalez contends that USHRN's "future conduct" argument

21   misses the mark because it "fails to appreciate the difference between Dr. Gonzalez being

22   an employee, and USHRN treating her as an employee." (Doc. 116 at 12-13.) Dr.

23   Gonzalez also identifies multiple occasions between December 2018 and June 2019 in

24   which USHRN represented that she was an employee. (*Id.*) As for the issue of justifiable

25   reliance, Dr. Gonzalez argues that although she "may have known USHRN was failing to

26   _____

27   [8]     Given this conclusion, it is unnecessary to resolve Dr. Gonzalez's evidentiary
     objections. (Doc. 116 at 1-2.) The Court did not rely on Exhibits 7, 9, and 27 to USHRN's

28   motion (board minutes) when determining that factual disputes preclude the entry of
     summary judgment in Dr. Gonzalez's favor. Nor did the Court rely on USHRN's purported
     conflation of individual and Rule 30(b)(6) testimony when making this determination.

treat her as an employee, . . . that does not negate USHRN['s] persistent actions representing her entitlement to employee treatment and therefore representing that she was an employee." (*Id.* at 13.) Dr. Gonzalez also notes that, "during that May [2019] period," she turned down another employment offer in reliance on USHRN's representation that she was an employee. (*Id.* at 13-14.)

In reply, USHRN begins by noting that Dr. Gonzalez does not defend Count Four based solely on the misrepresentations alleged in the FAC but "appears to be asserting multiple, new alleged misrepresentations" as the basis for the claim. (Doc. 123 at 9.) At any rate, USHRN argues that none of the alleged representations "constitute a false statement of fact" and instead are "nothing more than evidence that [USHRN] was in negotiations with Dr. Gonzalez regarding employment terms." (*Id.*) As for justifiable reliance, USHRN argues that because Dr. Gonzalez "claims she was misclassified as an independent contractor and that she was terminated for complaining about it" and also "received and accepted payments as an independent contractor for 11 months in 2019," it follows that "no reasonable juror could find that Dr. Gonzalez was justified in believing [USHRN] was treating her as an employee." (*Id.* at 10.)

### 3.  Analysis

Under Arizona law, "[a] person may be liable for negligent misrepresentation if he fails to exercise reasonable care and competence in obtaining or communicating information and thereby, in the course of his business or employment, provides false information for the guidance of others in their business transactions, causing the recipients of the information to incur damages because they justifiably relied on the false information." *PLM Tax Certificate Program 1991–92, L.P. v. Schweikert*, 162 P.3d 1267, 1270 (Ariz. Ct. App. 2007). However, "no claim of relief for negligent misrepresentation can be premised upon a promise of future conduct." *McAlister v. Citibank (Ariz.)*, 829 P.2d 1253, 1261 (Ariz. Ct. App. 1992). *See also Bowman v. Honeywell Int'l, Inc.*, 438 F. App'x 613, 615 (9th Cir. 2011) ("Under Arizona law, the tort of negligent misrepresentation requires a plaintiff to prove the defendant misrepresented present facts. A negligent

misrepresentation claim cannot be based upon a promise of future conduct.") (citation omitted).

On the one hand, Dr. Gonzalez's theory here is that USHRN misrepresented both that she *was already* an employee and that USHRN *would be treating her* as an employee for purposes of future benefits and pay. Although the latter may have been a promise of future performance, the former was not—it was an alleged misrepresentation of historical fact. As such, it may provide the foundation for a negligent misrepresentation claim.

These details distinguish this case from *Bowman*. There, "Honeywell misrepresented to Bowman—prior to December 10, 2007—that Bowman *would* start work at Honeywell on December 10, 2007 if she passed her background check." 438 F. App'x at 615. The Ninth Circuit concluded this statement could not provide the foundation for a negligent misrepresentation claim because the "purported misrepresentation would have dealt with a promise to hire [Bowman] *in the future*." *Id.* Here, in contrast, Dr. Gonzalez's theory does not rest solely on promises of future performance. *Cf. Sevigny v. DG FastChannel, Inc.*, 2013 WL 753489, *6 (C.D. Cal. 2013) ("Plaintiff's allegations do not amount to 'promises of future conduct' or predictions as to future events, but instead alleged statements regarding an existing fact . . . .").

On the other hand, if the only potentially actionable component of USHRN's conduct was the misrepresentation that Dr. Gonzalez was already an employee, it is difficult to understand how Dr. Gonzalez's reliance on that misrepresentation was justifiable. The only episode of reliance identified in Dr. Gonzalez's brief is her decision in May 2019 to turn down another job offer. But by May 2019, Dr. Gonzalez had already become aware that she was not being treated as an employee by USHRN—as discussed in Part II.B.3.a above, Dr. Gonzalez admitted that she became aware by no later than January 2019 that USHRN was violating the terms of her purported employment contract (because she was not receiving employee benefits and was being paid as a 1099 contractor). Although USHRN may have made subsequent promises to remedy the issue—promises that help rescue Dr. Gonzalez's contract-based claims from dismissal on statute-of-

limitations grounds—those promises cannot provide the foundation for Count Four because they were promises of future conduct.  The bottom line is that, at the time of her decision in May 2019 to turn down the other job offer, Dr. Gonzalez already knew of the falsity of USHRN's representation that she was an employee.  Such knowledge precludes a finding that Dr. Gonzalez's reliance on that misrepresentation was reasonable or justifiable.  *See, e.g., GoDaddy.com LLC v. RPost Communications Ltd.*, 2016 WL 3165536, *30 n.27 (D. Ariz. 2016) ("Under Arizona law, one cannot 'reasonably rely' on information that is [known to be] false."); *Wingate Land, LLC v. ValueFirst, Inc.*, 722 S.E.2d 868, 870-71 (Ga. Ct. App. 2012) (affirming grant of summary judgment to defendant on negligent misrepresentation claim in part because plaintiff "knew the information was false" before taking steps in purported reliance on it);[9] *Nat. Groups, LLC v. Nardi*, 75 A.3d 68, 73 (Conn. Ct. App. 2013) ("Even if the misrepresentation forms part of a binding agreement, a plaintiff cannot reasonably rely on a contractual term he knows to be false.").  *Cf. Godfrey v. Navratil*, 411 P.2d 470, 474 (Ariz. Ct. App. 1966), *overruled on other grounds as recognized in Horne v. Timbanard*, 434 P.2d 520 (Ariz. Ct. App. 1967) ("Assuming a false representation, there is still a point at which a buyer may be forced to abandon the protection of the false or misleading representation and open his eyes to that which is signalling danger, or thereafter proceed at his own peril . . . .  We believe this point was reached in this case when Navratil was handed the letter . . . contradict[ing] that which he said he was told by Godfrey . . . .  With such information before him under the circumstances as they existed at that time, Navratil no longer had a right to rely on the representation, false as it may have been.").

  For these reasons, USHRN is entitled to summary judgment on Count Four.

  …

  …

  …

---

[9]  This passage from *Wingate Land* was cited with approval in *Southwest Non-Profit Housing Corp. v. Nowak*, 322 P.3d 204, 209 (Ariz. Ct. App. 2014).

D.   **Damages**

1.   Background

One of the Dr. Gonzalez's damages theories in this case is that, due to USHRN's failure to classify her as an employee, she did not qualify for reduced payments under the Public Service Loan Forgiveness Program ("PSLF"), which is a federal loan forgiveness program for employees of public service organizations.  In response to an interrogatory seeking more information about this theory, Dr. Gonzalez wrote as follows:

> To have her loans forgiven under the [PSLF], a borrower needs apply after making 120 monthly payments on an eligible loan while being "employed" "full-time" in a "public service job" for each month of those payments and at the time of forgiveness.  Dr. Gonzalez reconsolidated her then-existing student loans under two qualifying Federal Direct Consolidated Loans in 2018.  Dr. Gonzalez made payments on those loans from August 2018 through July 2019.  Further, USHRN is a qualified "public service organization."

> But because USHRN never treated Dr. Gonzalez as an employee, *i.e.* paid her using a W-2 and otherwise complied with the law regarding treatment of employees, Dr. Gonzalez was not eligible for PSLF while working for USHRN. . . .  USHRN's office manager, Rachel Rivera, and then its temp office manager, refused to recertify Dr. Gonzalez as eligible for the PSLF program in 2019 . . . .  Further, because Dr. Gonzalez's eligibility will be reviewed when she applies for loan forgiveness, the "qualified payments" Dr. Gonzalez did make while at USHRN will not count because of the contrary treatment by USHRN.

> As mentioned above, Dr. Gonzalez has two qualifying consolidated loans: One originated in May 2018, and the second in August 2018.  The May 2018 loan has a principal balance of $704,021.41, with a monthly payment of $7,728.55; the August 2018 loan has a principal balance of $96,551.51, with a monthly payment of $1,127.03.  While working at USHRN, Dr. Gonzalez made payments for both loans from August 2018 through July 2019 that should have qualified for PSLF.  Because Dr. Gonzalez had qualified for income-based repayment, she only paid $45.22 per month on the May 2018 loan, and $6.59 per month on the August 2018.  But for USHRN's misclassification of Dr. Gonzalez, those payments would qualify under the PSLF program.  Thus, at a minimum, had USHRN properly treated Dr. Gonzalez as an employee, those qualified payments would have saved Dr. Gonzalez the difference between her ordinary monthly payment and the

income-based payments for the months of those payments, $105,645.24, upon completion of the remaining qualified payments and application for loan forgiveness.

There is no reason to doubt that Dr. Gonzalez would have made the remaining qualified payments. As Dr. Gonzalez's CV shows, she has always worked for state educational institutions or non-profits that would be qualified employers under the PSLF program. USHRN's wrongful termination of Dr. Gonzalez has further impaired her ability to make qualifying payments under the reduced rate. Had USHRN properly classified Dr. Gonzalez and permitted her to recertify her qualified employment, she would have continued making qualified payments from August 2019 to present, which, at the same income-based repayment amount, would have permitted Dr. Gonzalez to have an additional $193,682.94 forgiven (with a monthly difference of $8,803.77 between the amount Dr. Gonzalez paid under the income-based repayment plan and her loans' ordinary monthly payment).

(Doc. 106-1 at 210-12, citations omitted).

Separately, Dr. Gonzalez has also asserted a claim for punitive damages. (Doc. 11 at 8-9.)

### 2. The Parties' Arguments

USHRN seeks summary judgment as to Dr. Gonzalez's claims for student loan-related damages and punitive damages. (Doc. 106 at 15-16.) As for the former, USHRN contends the claim is speculative because Dr. Gonzalez "has no knowledge or evidence whether: (1) the 12 payments she made while working at USHRN have been or will be determined to be unqualifying or illegal payments by the federal government; (2) the PSLF program will even be in effect next year—let alone in 10 years; (3) she will even take another job with a public or non-profit employer such that she would qualify for potential PSLF relief; or (4) her loans would qualify for forgiveness even if she made the remaining 108 payments to reach the 120 payments required under PSLF." (*Id.*) As for the latter, USHRN cites *Holy Trinity Greek Orthodox Church v. Church Mut. Ins. Co.*, 476 F. Supp. 2d 1135 (D. Ariz. 2007), and *Murcott v. Best W. Int'l, Inc.*, 9 P.3d 1088 (Ariz. App. 2000), to support its position that Dr. Gonzalez has no evidence it acted with the requisite "evil

- 35 -

1  mind" when terminating her.  (*Id.*)

2          In response, Dr. Gonzalez argues that her claim for student loan-related damages is

3  not speculative because (1) she "has always been employed by other qualifying public

4  service organizations"; (2) "but-for [USHRN's] failure to treat [her] as an employee, [her]

5  payments in 2019 would have qualified, and she has been damaged"; and (3) "laws are

6  always subject to change; Courts consider the law applicable at the time of their decisions."

7  (Doc. 116 at 14-15.)  Dr. Gonzalez also contends her claim for punitive damages should

8  survive summary judgment in light of the "ample evidence that [USHRN] acted with an

9  evil mind," which includes the following: (1) USHRN became aware in January 2019 that

10 it was misclassifying her, when an attorney advised USHRN that the independent-

11 contractor classification was "not prudent," yet persisted with this misclassification until

12 terminating her; (2) the "backdated June 2019 offer letter" evidences USHRN's "evil

13 mind"; (3) an email exchange from January 2019 demonstrates that USHRN had "no intent

14 to honor the December 2018 oral employment agreement" and that USHRN did this

15 "knowing Dr. Gonzalez, a diabetic, was being denied medical insurances"; and (4) the

16 "offer letter contradicted [USHRN's] own handbook regarding the executive director's

17 exclusion from at-will status."  (*Id.* at 15-16.)

18         In reply, USHRN asserts that Dr. Gonzalez has not provided "evidence from the

19 federal government or any expert" with respect to eligibility under the PSLF program.

20 (Doc. 123 at 10-11.)  As for punitive damages, USHRN argues that Dr. Gonzalez "has no

21 claim that [USHRN] violated any statutory obligation regarding the provision of healthcare

22 benefits" and "only asserted punitive damages in connection with her AEPA claim and her

23 breach of contract claim."  (*Id.* at 11.)  USHRN also notes that it repeatedly made offers to

24 Dr. Gonzalez that included the provision of healthcare benefits, but she rejected those

25 offers.  (*Id.*)

26         …

27         …

28         …

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3. <u>Analysis</u>

a. **Student Loan Damages**

Under Arizona law, "[d]amages that are speculative, remote or uncertain may not form the basis of a judgment." *Coury Bros. Ranches, Inc. v. Ellsworth*, 446 P.2d 458, 464 (Ariz. 1968). However, "[u]ncertainty alone does not justify taking away a party's right to have evidence heard by a jury." *Felder v. Physiotherapy Assocs.*, 158 P.3d 877, 886 (Ariz. Ct. App. 2007). "The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount." *Lewin v. Miller Wagner & Co., Ltd.*, 725 P.2d 736, 741 (Ariz. Ct. App. 1986) (citation and internal quotation marks omitted).

Dr. Gonzalez's claim for student loan-related damages is too speculative because it rests on a chain of unfulfilled contingencies. Even assuming that USHRN misclassified Dr. Gonzalez as an independent contractor during the time period at issue in this case, such misclassification would only interfere with Dr. Gonzalez's eligibility under the PSLF if she subsequently took another qualifying job with a public interest employer and then made the required monthly loan payments for as many as 108 consecutive months. Arizona courts have not hesitated to reject analogous damage claims as excessively speculative. *Cf. Gerow v. Covill*, 960 P.2d 55, 60 (Ariz. Ct. App. 1998) (noting that damage claim was properly stricken in a case where "[t]he contingencies involved a speculative future event and the amount of damages from that event"); *Elizabeth M. Entertainment L.L.C. v. Whitcomb*, 2020 WL 428653, *4 (Ariz. Ct. App. 2020) ("EME first contended that if Williams had invested in EME, it would have rebranded from a live music venue to a nightclub in anticipation of the 2015 Super Bowl, which would have been successful based on Johnson's prior experience with a different nightclub. . . . EME's claimed damages were entirely speculative and uncertain because they were based on the putative success of a rebranding effort that never occurred and unsupported claims of profits of other bars and restaurants from seven years earlier.").

Although the issue presented here appears to be novel—the parties have not cited any case in which an employer was accused of interfering with an employee's eligibility for student loan forgiveness by misclassifying the employee as an independent contractor—several courts have analyzed damage claims related to PSLF eligibility in other contexts.  For example, in *Winebarger v. Pennsylvania Higher Education Assistance Agency*, 411 F. Supp. 3d 1070 (C.D. Cal. 2019), the plaintiffs were borrowers who entered into PLSF-eligible repayment plans for their student loans.  *Id.* at 1079-80.  The defendant was a loan servicing agency that, among other things, was responsible for providing "a monthly tally of each Plaintiff's qualifying payments" toward PSLF.  *Id.*  After the plaintiffs learned the defendant had miscalculated the number of qualifying payments they had made, they sued under a variety of contract and tort theories, arguing that "they will be harmed because they may be required to make more than the necessary 120 payments, thereby overpaying their loans, to obtain PSLF loan forgiveness." *Id.* at 1087.  The district court dismissed the complaint for lack of standing, concluding that the plaintiffs' "injury is purely hypothetical.  Plaintiffs may or may not make all their loan payments on time over the next five to seven years; [and] they may or may not continue to work for a qualifying employer for the required time . . . .  Thus, Plaintiffs' unfounded fear that they may need to make more than 120 qualifying payments to obtain PSLF loan forgiveness in five to seven years is wholly speculative and far too remote to confer standing."  *Id.*  In a related vein, the court held that because the plaintiffs' damage theory was predicated on "important contingencies," including "successfully completing the necessary 120 qualifying payments for loan forgiveness (and satisfying all other PSLF program requirements)," their claims were not ripe.  *Id.* at 1087-88.

Meanwhile, in *Meenan v. Navient Corp.*, 2020 WL 5057654 (D. Ariz. 2020), the plaintiff was a lawyer with over $87,000 in educational debt who contacted her loan servicer in 2008 to inquire whether her student loans were eligible for the PSLF program.  *Id.* at *1.  Between 2008 and 2010, the loan servicer's representatives repeatedly advised the plaintiff "that her loans and payment plan qualified."  *Id.*  These representations turned

1    out to be inaccurate and, as a result, "33 payments [the plaintiff] made prior to loan

2    consolidation in July 2011 did not count for PSLF purposes." *Id.* However, the plaintiff

3    did not sue the loan servicer immediately upon learning of the mistake. Instead, she waited

4    to sue until after "she made her 120th payment." *Id.* at *2. The defendant moved to

5    dismiss, arguing the plaintiff had waited too long to file suit, but the district court disagreed,

6    holding that the plaintiff "had not suffered the injury alleged in her complaint"—that is,

7    damages related to interference with PLSF eligibility—at the time the misrepresentations

8    initially came to light because, at that time, "it was unclear whether [she] would otherwise

9    qualify for the PSLF program. Any number of factors other than [the]

10   misrepresentations—such as a decision by [her] to enter the private sector to pursue more

11   lucrative employment—could have rendered her ineligible for loan forgiveness." *Id.* The

12   court continued: "[Her] claims were not ripe for judicial resolution in 2011 because the

13   injury she alleges—experiencing a delay to her loan forgiveness—was at that time

14   speculative. Her injury only arose and became concrete, thereby starting the statute of

15   limitations clock, once she made her 120th payment on November 1, 2019." *Id.*

16       The lesson to be distilled from *Winebarger* and *Meenan* is that a claim for damages

17   arising from purported interference with PSLF eligibility is speculative and unripe if the

18   plaintiff has not yet made the necessary 120 qualifying payments for loan forgiveness and

19   satisfied other PSLF program requirements. It is only when those contingencies have been

20   fulfilled that the claim ripens. *See also Lyons v. Great Lakes Educ. Loan Servs., Inc.*, 2022

21   WL 602972, *8 (D.N.J. 2022) ("Numerous student loan borrowers have brought suit

22   against student loan servicers claiming they were wrongfully denied access to the PSLF

23   program. Courts have generally held that the plaintiff borrowers do not have standing to

24   sue until they have suffered the actual injury alleged: making more than 120 payments

25   while working in public service."). Thus, Dr. Gonzalez's claim for student loan-related

26   damages is too contingent and speculative to survive summary judgment.

27       …

28       …

1

b.      **Punitive Damages**

2

Because all of Dr. Gonzalez's tort claims have now been dismissed and only her

3

contract claims remain, there is no longer any basis for an award of punitive damages.

4

*Lerner v. Brettschneider*, 598 P.2d 515, 519 (Ariz. Ct. App. 1979) ("punitive damages do

5

not lie for breach of contract").  Accordingly, USHRN is entitled to summary judgment on

6

the claim for punitive damages.[10]

7

E.      **Contractual Indemnity**

8

1.      Background

9

Both of the IC Agreements included a clause entitled "Indemnification," which

10

provided as follows: "Contractor shall indemnify, defend and hold [USHRN] harmless

11

from any and all costs, claims, losses and/or damages, of whatever kind and nature, arising

12

from, out of or in connection with the performance by Contractor of its obligations under

13

this Agreement, including but not limited to reasonable attorneys' fees incurred by

14

[USHRN] in defending itself from any and all such claims."  (Doc. 106-1 at 29, 35-36.)

15

USHRN has asserted a counterclaim against Dr. Gonzalez based on this

16

indemnification clause.  (Doc. 12 at 20-21 ¶¶ 53-62.)  USHRN alleges that, as a result of

17

Dr. Gonzalez's "actions while serving as Executive Director," various USHRN employees

18

"asserted certain claims" against USHRN, "including claims alleging violation of certain

19

employment laws," that USHRN was forced to incur costs and attorneys' fees to resolve.

20

(*Id.* at 18-19 ¶¶ 40-43.)  Thus, USHRN seeks to recover those costs and attorneys' fees

21

from Dr. Gonzalez pursuant to the indemnification clause.  (*Id.* at 21 ¶¶ 60-62.)

22

2.      The Parties' Arguments

23

Both sides move for summary judgment on USHRN's indemnification

24

counterclaim.

25

…

26

_____

27

[10]     Because the tentative ruling concluded that Dr. Gonzalez's claim for wrongful termination should survive summary judgment, it also included a discussion of the

28

sufficiency of the evidence supporting Dr. Gonzalez's claim for punitive damages. Because the wrongful termination claim has now been dismissed, the punitive damages analysis in the tentative ruling is moot.

1

a.     **USHRN's Motion**

2       USHRN has proffered evidence that three USHRN employees (Employee A,

3  Employee B, and Employee C) filed grievances against Dr. Gonzalez in June 2019 raising

4  claims of discrimination, retaliation, and/or improper discharge.  (Doc. 107-1 at 23-38.)

5  USHRN has also proffered a copy of a partially executed settlement agreement with

6  Employee A.  (*Id.* at 40-41.)  This document, which was signed by Employee A on October

7  23, 2019 but is not countersigned by any of the identified USHRN representatives, calls

8  for USHRN to send a check to Employee A's counsel within four weeks of execution.  (*Id.*)

9  Based on this evidence, USHRN contends it is entitled to summary judgment on its

10  indemnification counterclaim.  (Doc. 106 at 17.)  First, USHRN contends that Dr. Gonzalez

11  continued to be bound by the indemnification clause in the May 2018 IC Agreement for

12  purposes of her work in 2019, even though the May 2018 IC Agreement appeared to expire

13  on December 31, 2018, because she "voluntarily and willingly accepted payment under[]

14  the May [2018] IC Agreement from January 2019 through her termination on November

15  22, 2019" and "[c]ontinuing performance by the parties to an expired contract is sufficient

16  to prove the continued existence of the contract."  (*Id.*)  Second, USHRN contends that Dr.

17  Gonzalez is responsible for the costs associated with settling Employee A's claim because

18  the indemnification clause broadly required Dr. Gonzalez to indemnify USHRN for claims

19  "arising from" her work under the IC Agreement and Employee A's claim arose from her

20  work.  (*Id.*)

21       Dr. Gonzalez opposes USHRN's request for summary judgment on the

22  indemnification counterclaim.  (Doc. 116 at 16-17.)  First, Dr. Gonzalez contends there is

23  no evidence that USHRN actually paid any money to Employee A.  (*Id.*)  She notes that

24  the purported October 2019 settlement agreement is not fully executed and proffers email

25  correspondence (Doc. 116-5 at 61-66) showing that in November 2019—that is, after the

26  settlement was purportedly finalized—Employee A and USHRN were still in settlement

27  negotiations.   (Doc. 116 at 16.)   Second, and alternatively, Dr. Gonzalez contends that

28  USHRN's attempt to enforce the May 2018 IC Agreement against her pursuant to a

1    ratification theory is flawed because (1) she never ratified that agreement in 2019—instead,

2    she accepted an oral offer of employment; (2) ratification is an equitable doctrine designed

3    to prevent one party from obtaining an unjust benefit and "[t]here's no equitable reason

4    USHRN should benefit via an unused provision of an expired agreement as a result of [her]

5    honoring the parties' oral agreement and accepting partial performance while USHRN

6    failed to honor the same"; and (3) the parties' conduct in 2019 was not consistent with the

7    May 2018 IC Agreement, as evidenced by differences in how she was paid and her

8    complaints about USHRN's misclassification of her as an independent contractor.  (*Id.* at

9    16-17.)

10       In reply, USHRN argues that it did, in fact, make the settlement payment to

11   Employee A and identifies evidence in the record confirming the fact of payment (Doc.

12   123 at 11); argues that ratification is not an "equitable doctrine only applicable when one

13   party is unjustly benefiting" but instead is a "well established" contract-law doctrine that

14   "applies to scenarios where a party, who could otherwise avoid a contract, can bind

15   themselves to a contract through words or deeds" (*id.* at 11-12); and argues that there are

16   various pieces of evidence in the record establishing that the payments to Dr. Gonzalez in

17   2019 were the same as the payments to her in 2018 pursuant to the May 2018 IC Agreement

18   (*id.* at 12).

19                          b.    **Dr. Gonzalez's Motion**

20       Dr. Gonzalez seeks summary judgment on the indemnification counterclaim.  (Doc.

21   108 at 15-17.)  Her first two arguments mirror the arguments raised in her response to

22   USHRN's motion—she argues the counterclaim "fails as a matter of law" because (1) the

23   May 2018 IC Agreement expired on December 31, 2018 and thus "did not apply at the time

24   of the events allegedly underlying the counterclaim"; (2) USHRN has no evidence that "it

25   incurred any amount to defend against or settle the claim allegedly arising from [her]

26   employment as Executive Director."  (*Id.* at 15-16.)  Alternatively, Dr. Gonzalez argues

27   that USHRN cannot seek indemnification for any settlement related to Employee A

28   because "USHRN's Board facilitated and approved of [that] employee's termination" and

1    thus "USHRN is estopped from seeking indemnification." (*Id.* at 16-17.)

2         USHRN opposes Dr. Gonzalez's motion. (Doc. 115 at 14-15.) On the issues of

3    ratification and actual payment, USHRN incorporates the arguments raised in its

4    affirmative summary judgment briefing. (*Id.*) Finally, USHRN argues that estoppel is

5    inapplicable here because "[i]t was [Dr. Gonzalez's] idea to terminate Employee A," the

6    board merely "did not expressly disapprove of the termination or otherwise went along

7    with the termination," and Dr. Gonzalez "cannot possibly argue that she was somehow

8    induced to terminate Employee A when it was originally her idea that she actively pursued

9    and carried out." (*Id.* at 15.)

10        In reply, Dr. Gonzalez reiterates her argument that USHRN cannot rely on a

11   ratification theory to enforce the indemnification clause in the May 2018 IC Agreement

12   against her (Doc. 122 at 10); argues that the Court should disregard the declaration of the

13   USHRN board member avowing that a settlement payment was made to Employee A

14   because the declaration is "blatantly contradicted by the record" (*id.*); and argues that the

15   elements of estoppel (including justifiable reliance) are satisfied because she postponed the

16   termination decision until securing the board's "involvement and approval" (*id.* at 10-11).

17             3.    Analysis

18        Neither side is entitled to summary judgment on USHRN's indemnification

19   counterclaim.

20        First, although Dr. Gonzalez disputes whether USHRN sustained any damages that

21   might give rise to a claim for indemnification, the evidence proffered by USHRN is

22   sufficient to create a triable issue of fact on the question of damages. Even though USHRN

23   needlessly complicated matters by submitting what appears to be a superseded and only

24   partially executed version of its settlement agreement with Employee A, one of USHRN's

25   board members avowed in a declaration that "USHRN paid the amount specified in the

26   Settlement Agreement to Employee A." (Doc. 106-1 at 287-88 ¶ 15.) This evidence does

27   not "blatantly contradict" the proffered copy of the partially executed settlement agreement

28   because it is possible that the payment came after the parties finalized the settlement

1    agreement.

2         Second, as for ratification, the rule in Arizona is that "[a] person not bound by a

3    contract may ratify the contract and thus become bound by its terms, by affirming the

4    contract through words or deeds.  We will infer an intent to ratify if a non-party to the

5    contract voluntarily accepts benefits conferred by the contract."  *All-Way Leasing, Inc. v.*

6    *Kelly*, 895 P.2d 125, 128 (Ariz. Ct. App. 1994) (citing, *inter alia*, Restatement (Second) of

7    Agency § 82 (1958)).  *See also Autohaus Brugger, Inc. v. Saab Motors, Inc*., 567 F.2d 901,

8    915 (9th Cir. 1978) ("When an agreement expires by its terms, if, without more, the parties

9    continue to perform as theretofore, an implication arises that they have mutually assented

10   to a new contract containing the same provisions as the old. . . .  Ordinarily, the existence

11   of such a new contract is determined by the 'objective' test, *i.e.*, whether a reasonable man

12   would think the parties intended to make such a new binding agreement whether they acted

13   as if they so intended.") (quoting *Martin v. Campanaro*, 156 F.2d 127, 129 (2d Cir. 1946)).

14   Here, USHRN has proffered evidence that, construed in the light most favorable to its

15   position, suggests that Dr. Gonzalez agreed to continue working in 2019 under the terms

16   of the May 2018 IC Agreement by continuing to accept benefits that were the same as those

17   owed to her under the May 2018 IC Agreement.  (Doc. 106-1 at 61-62 [Dr. Gonzalez's

18   admission, during her deposition, that the "payment amounts" she received in 2019 were

19   "the same amounts [she] was receiving under the" May 2018 IC Agreement]).  However,

20   Dr. Gonzalez has proffered conflicting evidence that, construed in the light most favorable

21   to her, suggests she did not agree to continue working in 2019 pursuant to the terms of the

22   May 2018 IC Agreement—indeed, as discussed elsewhere in this order, Dr. Gonzalez has

23   proffered evidence that she entered into an oral and/or implied employment contract in late

24   December 2018 that superseded the previous independent contractor arrangement and

25   thereafter complained about the illegality of her continued classification as an independent

26   contractor.  These disputes of fact preclude the entry of summary judgment in either side's

27   favor on the issue of ratification.

28        Third, even assuming that estoppel might be a valid defense to USHRN's

indemnification counterclaim, there are genuine issues of disputed fact about whether Dr. Gonzalez can make the required showings of inducement and justifiable reliance.  *Carlson v. Arizona Dept. of Econ. Sec.*, 906 P.2d 61, 62 (Ariz. Ct. App. 1995) ("Equitable estoppel is generally applicable when the following factors are present: (1) conduct by which one induces another to believe in certain material facts; and (2) the inducement results in acts in justifiable reliance thereon; and (3) the resulting acts cause injury.").  The evidence proffered by USHRN, construed in the light most favorable to USHRN's position, suggests that the USHRN board did not induce Dr. Gonzalez to terminate Employee A but simply went along with her termination decision.  (*See, e.g.,* Doc. 115-10 at 3 [May 1, 2019 email from Dr. Gonzalez to outside counsel, explaining that "I informed them [USHRN board] that I do not want to mediate but rather move to separate"]; Doc. 115-8 at 2 [May 15, 2019 email from Dr. Gonzalez to USHRN board members, seeking a "quick check in to make sure you understand and support my proposed next steps," which were described in an earlier part of the email chain as "I can't supervise [Employee A] anymore.  He must separate as soon as possible."].)

Accordingly,

**IT IS ORDERED** that:

1. USHRN's motion for summary judgment (Doc. 106) is **granted in part and denied in part**.

2. Dr. Gonzalez's motion for partial summary judgment (Doc. 108) is **denied**.

Dated this 29th day of July, 2022.

Dominic W. Lanza
United States District Judge